STATE v. C. W. STEWART AND ELMER STEWART.

(Filed 1 April, 1925.)

**1. Grand Jury—True Bill—Twelve Jurors—Motion to Quash—Abatement.**

The presence of the full number of the grand jury in finding a true bill under an indictment for murder is not necessary, and an endorsement thereon and finding by twelve thereof, or more, is sufficient, and a motion to quash under a plea in abatement on that ground is properly denied. C. S., 2333.

STATE *v.* STEWART.

### 2. Courts—Evidence—Correction of Error.

It is competent for the judge, upon a trial for murder, to correct the admission of incompetent evidence, and withdraw it from the consideration of the jury, and so instruct them.

### 3. Trials—Courthouse—Statutes—View of Jury.

Upon a trial for murder,.and at the request of the prisoners, the court permitted the jury to view the scene of the crime for the purpose of locating certain places and positions that had been testified to and, over defendant's objection, testimony of certain witnesses who had not theretofore testified: *Held*, the organization of the court at the place of the homicide is regarded as a continuance of the trial held at the courthouse, and not prohibited by C. S., 1443, prohibiting trials to be had elsewhere than at the courthouse; and under the facts of this case it is not reversible on appeal as error prejudicial to the defendants. The inherent power of the court in such instances discussed by ADAMS, J.

### 4. Murder—Evidence—Parties—Strangers.

Under the facts in this case, *held*, it was not error for the trial judge to exclude evidence that the deceased police officers had warrants for arrest of another person as well as of the prisoners on trial, for the purpose of showing animus against the deceased by another, and that he had committed the murder for which the prisoners were on trial.

### 5. Criminal Law—Conspiracy—Evidence—Instructions.

Where there is evidence tending to show that the prisoners on trial for murder had entered into a conspiracy to kill the deceased, an instruction is proper that each party to a criminal conspiracy is the agent of the other, and that an act in furtherance of the common design done by one of them is the act of all.

### 6. Murder—Circumstantial Evidence—Instructions.

*Held*, under the evidence on this trial for murder, the instruction of the court as to the requisites of circumstantial evidence was correct, and it was not error for him to refuse to give a requested prayer of defendants upon the same principle differently expressed.

### 7. Instructions—Evidence—Appeal and Error.

A requested prayer for instruction that presents a principle of law not sustained by the evidence in the case is properly refused.

### 8. Criminal Law—Homicide—Murder—Verdict—Polling Jurors—Recommendation for Mercy.

Where, upon the rendering of an adverse verdict to the defendants on trial for murder, their attorney requests the polling of the jury, and, acting in response to the judge's question to each of the jurors asked accordingly, they each responded guilty of murder whereof they were charged, and upon a second inquiry by the court, responded guilty of murder in the first degree: *Held*, the verdict was not objectionable as being too indefinite, and sentence thereon was properly imposed: *Held, further*, a recommendation for mercy was not properly to be considered as a part of the verdict.

APPEAL by defendants from *Grady, J.,* at September Term, 1924, of BRUNSWICK.

The prisoners were indicted for the murder of Leon George and Sam Lilly and upon conviction of murder in the first degree they appealed from the judgment pronounced thereon.

The State's theory was substantially as follows: On 29 July, 1924, between 4 and 5, afternoon, W. H. Russell saw the deceased Leon George and Sam Lilly, officers of the law, at the Chinnis store. They had a Ford touring car in which were a small whiskey still and an Airedale terrier. They took out the still, said they were on the trail of Elmer Stewart, and went away in the direction of Bob's Branch. Russell lived a half-mile from the Chinnis store and within fifty yards of the prisoners. After returning home he went to the Stewart house and told the prisoners what he had seen and heard. They inquired as to the still and the direction in which the officers had gone. Elmer Stewart then brought up a Dodge touring car and his father, C. W. Stewart, told him the buckshot shells were in his trunk and gave him a bunch of keys. In a few minutes they passed Russell's home in the Dodge car going towards the place where the dead bodies of the officers were afterwards found.

The officers after leaving the Chinnis store crossed over Bob's Branch and later in the afternoon were seen coming back by the home of David Hooper and passing down into the branch. In a few minutes the Hoopers and Fuller McFadden heard shots together with threats and profane language. In a few minutes thereafter the dead bodies of the two officers and the dog were found a few yards from the branch. George was in the front seat of the car, the dog on the back seat, and Lilly on the ground behind the car. All the buckshot were fired from the front, but the bullet in George's head entered from the right. The officers' car did not stop running until the guns fired; but after the firing had ceased another car was heard to turn around about 228 feet from the scene of the homicide. The car had U. S. cord tires and the track was followed into the Fuller McFadden road and thence to the prisoners' garage. On the edge of the road near the Ford car at an elevation of about 7½ feet and about 88 feet distant from the car was a trampled or standing place. Soon after the shots were heard the prisoners returned home, the elder carrying a gun and the younger two pistols. The buckshot found in the bodies of the deceased and the buckshot shells found on the ground where the shooting occurred were identical with those found in the Stewart garage.

After they returned home Elmer Stewart went away in a Ford truck and C. W. Stewart spent the night away from home. There was evidence that C. W. Stewart went to Amos Wallace's house the same night and made a confession of his guilt, reciting the various circumstances which

it is not necessary to set out in detail. Other evidence was offered tending to show incriminating remarks by C. W. Stewart.

The defense was a complete denial of the State's theory, and an alibi. The prisoners contended they had hidden a condenser on Fuller McFadden's land and on the afternoon in question had gone there to see whether it could be fitted to a certain apparatus used by Elmer Stewart in the swamp, and, finding that it could not, had left it in the woods. They denied having a gun or pistol; denied any admission or confession; and contested the truth of all the material evidence offered by the State. The exceptions are stated in the opinion.

*Attorney-General Brummitt and Assistant Attorney-General Nash, for the State.*

*John D. Bellamy, William M. Bellamy and David Sinclair for appellants.*

ADAMS, J.    Before their arraignment the prisoners filed a plea in abatement and moved to quash the indictment on the ground that the bill had been considered, passed upon, and approved by the grand jury when only thirteen of its members were present. This body, serving for a period of six months, had been impaneled and charged at a former term; but when the indictment was found five of the number were unavoidably absent. All who were present voted to endorse and return the indictment "a true bill." Afterwards two of the absent members came in, but took no part in finding the indictment or returning it into court.

There was no error in denying the motion to abate the prosecution. At common law the indictment was sufficient if twelve members of the grand jury assented. In *Rex v. Marsh,* 6 A. & E., 237 (112 Eng. Reports, 89), it is said: "It is sufficient that twelve found the bill. An indictment is 'an accusation found by an inquest of twelve or more upon their oath'; Co. Litt., 126 b.   In 2 Hale's P. C., 154, it is stated that the sheriff, on precept to him, is to return twenty-four or more persons, out of whom the grand inquest is to be taken and sworn; and at p. 161 it is said that, 'If there be thirteen or more of the grand inquest, a presentment by less than twelve ought not to be; but if there be twelve assenting, though some of the rest of their number dissent, it is a good presentment.' In Com. Dig., indictment is said to be an accusation, 'found by a proper jury of twelve men'; and the same definition (as to number) is given in 4 Hawk, P. C., 1, book 2, ch. 25 (7th ed. by Leach).   In 4 Bla. Com., 306, it is said that 'to find a bill, there must at least twelve of the jury agree'; and 'no man can be

convicted at the suit of the King of any capital offense, unless by the unanimous voice of twenty-four of his equals and neighbours; that is, by twelve, at least, of the grand jury, in the first place, assenting to the accusation; and afterwards by the whole petit jury.' 'But if twelve of the grand jury assent, it is a good presentment, though some of the rest disagree.' And in 14 Vin. Abr., 377, Indictment (H. 9), Pl. 5, it is said that the caption ought to show that the indictors 'were twelve in number.' Compare 2 Haw. P. C., ch. 25, sec. 15; 1 Chit. Cr. Law, 311; 2 Bishop's New Cr. Pro., sec. 854.

With reference to the number necessary to the finding of an indictment the common law obtains in North Carolina and is not affected by the provision that the eighteen jurors first drawn shall be a grand jury for the court. C. S., 2333; *S. v. Davis,* 24 N. C., 153; *S. v. Barker,* 107 N. C., 914; *S. v. Perry,* 122 N. C., 1018; *S. v. Wood,* 175 N. C., 809, 816.

During the progress of the trial at the request of counsel for the prisoners and with the consent of the State, the court, the jury, the prisoners and all the attorneys, except one of those representing the prisoners, went to the scene of the homicide. There the court was opened in the usual way and the prosecuting officer suggested that the position of the Ford car and the trampled spot be pointed out by the witnesses, but the prisoners objected to the taking of any evidence. Thereupon L. R. Early, who had previously testified in the courthouse as to the position of the Ford car, the dead bodies, the place where the other car had turned around, and other circumstances, was permitted to identify the several places to which he had referred and certain land-marks by which he was guided; and A. A. Nelms and R. C. Fergus indicated places where shells and wadding had been found. Mattie Hooper, also was introduced as a witness for the State. She lived near the place of the homicide and testified as to what she had seen and heard at the time the shooting took place.

The prisoners have vigorously assailed this entire proceeding and have insisted that their rights were thereby impaired and their defense materially prejudiced.

After the examination of the witnesses just referred to the court returned to Southport and reconvened in the courthouse. Thereafter (the time is not definitely fixed) the judge struck from the record the entire testimony of Mattie Hooper and directed the jury not to consider it and to disregard any impression it might have created. He also instructed them not to consider the result of their "crouching observation" from one of the places pointed out by L. R. Early.

The power of the court to withdraw incompetent evidence and to instruct the jury not to consider it has long been recognized in this

State. Of course there are circumstances under which such power may not be exercised, as in *Gattis v. Kilgo,* 131 N. C., 199, with which may be compared *S. v. Bryant, ante,* 112. But here the presiding judge merely corrected the inadvertent admission of evidence which he afterwards conceived to be incompetent and to which the prisoners had objected. The withdrawal of the testimony was favorable to the defense and is sustained by a number of our decisions. In *McAllister v. McAllister,* 34 N. C., 184, *Ruffin, C. J.,* said: "It is undoubtedly proper and in the power of the court to correct a slip by withdrawing improper evidence from the consideration of the jury, or by giving such explanations of an error as will prevent it from misleading a jury." He expressed the same opinion more than three-quarters of a century ago and the practice has been observed since that time. *S. v. May,* 15 N. C., 328; *S. v. Davis, ibid.,* 612; *S. v. Collins,* 93 N. C., 564; *S. v. McNair, ibid.,* 628; *Bridgers v. Dill,* 97 N. C., 222; *S. v. Crane,* 110 N. C., 530; *Wilson v. Mfg. Co.,* 120 N. C., 94; *S. v. Lunsford,* 177 N. C., 117; *S. v. Dickerson, ante,* 327.

But a graver question is raised by the exception of the prisoners to the taking of any evidence at the place of the homicide. They say their request for the jury to visit the scene resulted in the introduction of a novel mode of developing the evidence which was without warrant in criminal procedure and destructive to their defense.

Under the practice at common law, the power to order a view by the jury in certain civil actions rested in the sound discretion of the court, and by 4 and 5 Anne, ch. 16, it was seemingly extended to all civil actions, while in criminal actions there could be no rule for a view without mutual consent. This statute was repealed by 6 George IV, ch. 50, by which it was provided that a view should be ordered if necessary in any case, civil or criminal. The officer serving the writ was commanded to have six or more of the jurors to go to the place in question, at some convenient time before the trial; and the place was to be designated by two persons appointed by the court. 1 Reeves' His. Eng. Law, 435; *Reg. v. Whalley,* 61 E. C. L. R., 376; Thompson on Trials, 665. Thompson says that in criminal cases there was no warrant in the English practice for sending the jury out to make a view, except when such a course was authorized by statute. Trials, Vol. sec. 8, 895. In several of the States such statutes have been enacted; but in *S. v. Perry,* 121 N. C., 533, it was held that the courts have inherent authority in their search for the truth to resort to this procedure. It was held, too, that evidence should not be taken on such occasions, the object being merely to present the scene to the jury more vividly than is possible by the description of witnesses. It was suggested that, under the settled practice, "showers" should be appointed by the court to point

.out the *locus in quo,* so as to enable the jury to apply the evidence developed on the trial.

Chiefly upon *S. v. Perry, supra,* the prisoners rest their exception to the taking of the evidence at Bob's Branch; but that decision is applicable to cases in which the "showers" make known to the jury the scene described, and evidently was not intended to cover the facts embraced in the present record. Here there was a sharp conflict as to whether the prisoners were near the place where the Ford car was standing when the dead men were found. The car had been removed to Wilmington for storage, and it was essential to show the place where it had been found, and its distance at that time from other identified places. The prisoners requested a view of the locality, and accordingly the court, the jury, the solicitor, the prisoners, two of their attorneys, and certain witnesses went to the place where the homicide had occurred. The court held a short session there, and admitted evidence tending to identify the several disputed spots. The witnesses who testified on behalf of the State were, of course, subject to the prisoners' right of cross-examination. Indeed, with one exception, all these witnesses were in fact cross-examined.

The cardinal objection urged to this procedure was the asserted disregard of the statutory provision that a Superior Court shall be held by a judge thereof at the courthouse of each county. C. S., 1443. The place for holding a term of court is usually fixed by constitutional or statutory provision, and as a general rule issues of fact cannot be tried at any other place. *Bynum v. Powe,* 97 N. C., 374. But here the term was held at the courthouse in Southport, and the court, by virtue of its inherent power, granted the prisoners' request for a view of two or three places near the branch, frequently referred to by the witnesses, but difficult if not impossible of satisfactory identification by "showers," because the Ford car had been removed. The jury were permitted to consider only such part of the evidence taken at the branch as tended to make plain the position of the objects described, and the reception of this evidence should be treated as a continuance and essential part of the regular term. After critical examination of the proceeding complained of, we find no error which was fatal or prejudicial to the defense relied on, or to the prisoners' constitutional rights, and the exceptions addressed thereto must be overruled. Const. N. C., Art. IV, sec. 10, *et seq.; S. v. Perry, supra; Jenkins v. R. R.,* 110 N. C., 438; *People v. Thorn,* 42 L. R. A., 368, note; *People v. Averback,* Ann. Cas., 1915B, 568, note.

While, under the singular circumstances of this case, we find no reversible error in permitting the witnesses to identify the place where the crime was committed, we must not be understood as commending

the practice. There may be instances in which a view by the jury is necessary, but in criminal actions it is always hazardous and not infrequently an obstruction rather than an aid in the administration of justice. In any event, the court should permit such view only when satisfied that it will contribute to and not retard the due and orderly procedure which has been established as the best product of judicial thought.

The prisoners excepted to the exclusion of evidence tending to show that the deceased officers had a warrant for some one other than the prisoners, and that certain persons in no way connected with the trial had made threats against these officers, or one of them, or had both an opportunity and a motive for committing the crime with which the prisoners were charged. The object was to prove that the homicide had been committed by a third party. This is not permissible under the instant facts. A recent and learned discussion of the question by *Mr. Justice Walker* appears in *S. v. Lane,* 166 N. C., 333, 338, in which, with citation of authorities, there is a clear statement of the principle upon which the ruling is made to rest.

The exceptions presented in the sixteenth, seventeenth, eighteenth, and nineteenth assignments of error relate to instructions in reference to the law of conspiracy and flight; but in these instructions we see no ground for a new trial. As to conspiracy, the judge substantially charged the law as set forth in several decisions of this Court involving the doctrine that each party to a criminal conspiracy is the agent of all the others, so that an act done by one in furtherance of the unlawful design is the act of all. There was evidence of such conspiracy, but none of repentance or withdrawal by either party before the crime was committed. *S. v. Connor,* 179 N. C., 752. Flight, it is true, is not in itself an admission of guilt; but, when established, it is a fact which, together with a series of other circumstances, may be so associated with the fact in issue as, in the relation of cause and effect, to lead to a satisfactory conclusion. Considered in its proper setting and in its relation to other parts of the charge, the instruction complained of, as we understand it, imports only this—that the jury might consider evidence of flight in connection with other circumstances in passing upon the question whether the combined circumstances were tantamount to an implied admission of guilt, and not that flight *per se* constitutes such an admission or raises a presumption of guilt. When so considered, the instruction is in accord with the authorities in this jurisdiction. *S. v. Tate,* 161 N. C., 280; *S. v. Hairston,* 182 N. C., 851. His Honor took care to say that neither flight nor attempted concealment created a presumption of premeditation and deliberation. *S. v. Foster,* 130 N. C., 666.

The court's alleged refusal to give a special prayer as to the requisites of circumstantial evidence forms the twenty-third assignment of error. Upon this phase of the case his Honor's charge was in strict conformity with the law as laid down in *S. v. Wilcox,* 132 N. C., 1120 and other decisions, and was as favorable to the prisoners as they could reasonably demand.

The prayer set out in the twenty-fourth assignment is open to the objection that it recites an abstract proposition of law based upon a philosophical discussion of the difference between a confession of evidence and evidence of a confession without applying the proposition in any way to the testimony of the witnesses. The instruction, for this reason, if for no other, was properly declined. *S. v. Rash,* 34 N. C., 382; *S. v. Murph,* 60 N. C., 129; *S. v. Anderson,* 92 N. C., 733; *S. v. Speaks,* 94 N. C., 865.

Exceptions to the remaining prayers are so clearly without merit as to require no discussion. Assuredly, the judge would not have been justified in telling the jury there was no evidence tending to prove the guilt of Elmer Stewart; and so much of the other prayers as the prisoners were entitled to is embodied in the charge.

On Sunday morning the jury announced that they had reached a verdict, and the following proceeding took place:

"The Court: Gentlemen, have you agreed on a verdict?

"The Jury: Yes, sir; we have.

"The Court: Who shall speak for you?

"The Jury: The foreman.

"The Court: Gentlemen of the jury, look upon the prisoners. What say you as to C. W. Stewart and Elmer Stewart? Are they guilty of the murder whereof they stand charged, or not guilty?

"The Foreman: Guilty, with the mercy of the court.

"The Court: Guilty of what?

"The Foreman: Guilty of murder in the first degree.

"The Court: You find them both guilty of murder in the first degree?

"The Foreman: Yes, sir, with the mercy of the court.

"Counsel for the defendants asked that the jury be polled.

"The Court: All right. Mr. Clerk, call the jury.

"And each of the jurors answered 'Yes.'

"The Court: By polling the jury, it means that each one of you is asked the question as to whether or not you did find the prisoners guilty of murder in the first degree. That is true, is it?

"All of the jurors answered 'Yes.'"

The prisoners made a motion in arrest of judgment, on the ground that the verdict was too indefinite, and a motion to correct the verdict, and excepted to the denial of each motion. In refusing these motions

there was no error. The verdict was entered on the records of the court as it was returned, so there was nothing to correct; and the jury's recommendation of mercy was mere surplusage and no part of the verdict. This conclusion was reached in *S. v. McKay,* 150 N. C., 813, and approved in *S. v. Hancock,* 151 N. C., 699, and in *S. v. Snipes,* 185 N. C., 743.

After bestowing upon the record, the briefs, and the oral argument the care and reflection which the gravity of the crime demands, we perceive no error which entitles the prisoners, or either of them, to a new trial.

No error.