STATE v. JAMES HENDERSON.

(Filed 16 June, 1939.)

1. **Jury § 8: Constitutional Law § 27: Criminal Law § 81a—Evidence held to support finding that names of colored citizens were not excluded from jury box.**

   Defendant, a Negro, filed a plea in abatement before the selection of a jury on the ground that qualified members of his race had been excluded from the jury box. The trial court found upon supporting evidence that the names of qualified members of the Negro race had been placed in the box and that the jurors were properly selected therefrom by a child under ten years of age, and overruled the plea in abatement. *Held:* The findings of the trial court are conclusive upon appeal and the ruling of the court will not be disturbed, there being no evidence of any abuse of discretion.

2. **Criminal Law §§ 44, 81a—A motion for continuance is addressed to discretion of the trial court.**

   A motion for continuance is addressed to the discretion of the trial court, and where it appears that counsel appointed were given the names of the State's witnesses, that defendant confessed the commission of the crime, and that he presented numerous witnesses who testified in support of the matter asserted by him as a defense, defendant's exception to the refusal of the court to grant a continuance cannot be sustained, there being no indication of any abuse of discretion.

3. **Criminal Law § 77c—**

   Where the charge of the court is not in the record, it will be presumed that the court fairly and correctly charged every phase of the law applicable to the evidence.

APPEAL by defendant from *Burgwyn, Special Judge,* and a jury, at November Term, 1938, of NEW HANOVER.  No error.

The defendant was tried on a bill of indictment charging him with murder, on 6 November, 1938, of Mrs. Stella Hobbs.  The jury rendered a verdict of murder in the first degree.  The court below pronounced judgment of death by asphyxiation.

Mrs. Stella Hobbs, 43 years of age, whose husband had been dead for about one year, was last seen by her daughter on Sunday morning, 6 November, between 4:30 and 5 o'clock, when the daughter had gone back to sleep while her mother was talking to her from her bedroom. Her body was found early Sunday morning about 3 feet from the back of her overturned automobile.  No glass in the automobile was broken. It was lying on its right side, but the top of the automobile looked as if it had been torn or cut, or pulled loose.  The hole in the top was large enough to get a body through.  The head was lying in a pool of blood and there were two wounds on the right side of the head above the ear about the size of a quarter.  The skull was knocked in and this brain wound was sufficient to have caused death.  The body was covered with bruises, particularly around the face and eyes.  A further examination that afternoon showed evidence of recent intercourse.  The body was in such a position that the deceased could not have been thrown from the car, and there were no tracks of her own shoes, nor anything to show how she got there.

The defendant, a 20-year-old Negro, about six feet three inches tall, weighing 190 pounds, was seen running from the scene of the accident early Sunday morning.  His shoes fit the tracks leading from the car. A lug wrench was found in the car with some blood and hair on the socket end, the hair being the same as the deceased's.

The defendant made two statements to the police.  The record shows that these statements were made voluntarily and without compulsion. The first statement was made on Monday, and the defendant stated that Mrs. Hobbs wanted him to buy some whiskey for her and that he finally got into the car and that she drove so recklessly that they turned over. He then stated that he put his feet on the seat and pushed his head and shoulders through the top but did not help her out.  He ran from the scene of the accident and stated that he was afraid to report it.  The defendant stated that she was getting out of the car when he ran off, but later, in the same statement, he says: "I don't believe she regained consciousness after the car turned over."

The second statement was made to the police on Tuesday.  The defendant again stated that Mrs. Hobbs tried to get him to buy some whiskey for her and that finally he got in the car and, at her direction, drove, although he had no experience in driving an automobile.  He

admitted the intercourse and stated that the accident happened while he was attempting to turn around. He stated that he pulled Mrs. Hobbs through the hole in the top of the car, and that she was mad and threatened him and that he struck her with his fist and hit her with a lug wrench and then ran.

The defendant went on the stand in his own behalf. According to this testimony, Mrs. Hobbs was drunk, and the defendant himself was so drunk that he didn't know what he was doing, although his testimony was inconsistent on this point. There is considerable confusion in his attempts to deny the statements made to the police. Consider the following testimony in regard to his second statement, admitting that he struck the deceased with the lug wrench.

"They said they had my fingerprints on the wrench, and if they had, I must have had my hand on it, and if I was the only one that touched the wrench I must have hit her. I only made the statement about striking Mrs. Hobbs from the suggestions made me by the officers."

"The officers explained she was hit and I said I must have did it. I didn't deny hitting her and I still don't."

C. David Jones, sheriff, recalled, testified: "On Monday of this week I had a conversation with the defendant relative to these two statements. He told me the first statement he made on Sunday night was not true, or that the statement he made on Monday rather, was not true, but the one he made on Tuesday was true, but for one thing that he wanted to get straight; that he wanted to tell the truth about the whole thing, and didn't want to leave a blemish, or anything, on Mrs. Hobbs' character, because he had known her and had nothing against her. He said in the presence of his mother on Monday night, Mr. Fales, Mr. Thompson and myself that there was one point he wanted to clear up in his second statement, which had been made on Tuesday, the 8th of November, and that was that Mrs. Hobbs was a good woman, and had a boy and girl that were nice children, and he didn't want to leave the blemish against the children, and that Mrs. Hobbs didn't know anything about the intercourse; that she didn't give her permission, and I asked the question, 'James, what caused you to do that; what caused you to do what you did and to kill Mrs. Stella?' and he said, 'I don't know, sir.' I said, 'Were you drunk?' He said, 'I was drinking.' I said, 'Was it the animal passion that got the best of you?' and he said, 'It was both.' That is about the sum and substance of what was said."

The evidence of the State was that the deceased, Mrs. Stella Hobbs, was 43 years old and was the widow of J. T. Hobbs, who died 3 October, 1937. A colored woman, Janie Williams, worked for Mrs. Hobbs whenever she went for her. The deceased would usually leave early on Sundays to go for Janie Williams and would travel in her car. The

deceased was at her home something like a quarter to five o'clock on Sunday morning, 6 November, 1938, and was found dead about 6:30 o'clock that morning. She had gone in the direction of Janie Williams' home in her car.

The confession of defendant was corroborated in every respect. The State's evidence was to the effect that the deceased was raped and then murdered by defendant. That the part of defendant's confession that she consented to the intercourse and her drinking at the time was untrue. The defendant lived about a block from the dead woman. The confession was corroborated in all material respects—the fastness of the car, he was seen running from the scene of the crime and told witness Elvin Lee : "And I said what are you doing down here, and he said tending to some business, and he said don't tell any damn body you saw me."

As to the identity of the footprints, W. D. Thompson, witness for the State, testified, in part: "His shoe fitted the track as perfect as it was possible to fit it. He later admitted to me in the presence of other officers that the track I fitted his shoe in—the two tracks—were made by him."

The defendant testified in part: "The last thing I remember during the drive was when the car turned over. It turned over one way or the other; I don't remember which way it turned over, but after I managed to get out of the car, I taken her by my ownself—I must have helped Mrs. Hobbs out of the car. I don't know what I did, but I must have, and after that I don't know anything that happened. . . . I was driving the car when it turned into Thirteenth Street, and Mrs. Hobbs was unable to drive herself. She was absolutely drunk. I don't think she knew a thing. . . . I don't recall saying anything to my mother on Monday night. I said several things to her, and asked how she was. I told her in case they found me guilty, which I am not, and was condemned to die, I told her not to bring my body home. That is all I told her. I did say I didn't want to leave a stain on the children of Mrs. Hobbs. I said I wanted to say I didn't have an intercourse with her with her consent. If I had it, it had to be without her will; she would never have given her consent. These officers said there were bruises on her jaw, and that she was hit with my fist, and I told them my being the only man with her, I must have hit her. I don't know what's in that paper about hitting her on the jaw. I know what I said as far as I am able to call back. The officers did not know about my confession. The officers explained she was hit and I said I must have did it. I didn't deny hitting her, and I still don't. I don't know whether she was standing, stooping or sitting. I didn't have the wrench home with me when I got home; I didn't have it in the bed with me.

I don't know what I did with it. I don't recall especially running. I don't know whether I fell down."

It was in evidence that defendant had been arrested for vagrancy and his fingerprints taken. The defendant introduced several witnesses as to his drinking pretty heavily Saturday night; playing pool and when he missed a ball would curse, etc. "He was drinking, I would not say he was what you call real drunk." Thos. Betts, witness for defendant, testified: "I know James Henderson. I saw him Sunday morning at my home. . . . I could not say he was drunk but he was under the influence; a drunk man can't walk. That was five minutes to six Sunday morning. It was not dark at that time."

Upon the judgment of death being pronounced, on the verdict of guilty of murder in the first degree, the defendant made several exceptions and assignments of error and appealed to the Supreme Court. They and the necessary facts appearing in the record will be considered in the opinion.

*Attorney-General McMullan and Assistant Attorneys-General Bruton and Wettach for the State.*

*Alan A. Marshall and W. F. Jones for defendant.*

CLARKSON, J. The exceptions and assignments of error are as follows: (1) The defendant, before the selection of a jury, filed in writing a plea in abatement based on the exclusion of qualified members of the Negro race from the jury box. We think there is no error in the denial of the plea on this record. (2) The denial of defendant's plea for a continuance. In this we can see no error.

The court below on the plea in abatement being filed by defendant, made the following entry in the record: "This cause coming on to be heard before the undersigned judge, the following facts are found: That the defendant was indicted by the grand jury of New Hanover County of murder in the first degree, true bill for same being returned by the grand jury on the morning of the 14th of November, and the court being apprised of the fact that the defendant was without counsel, and without means to provide private counsel for his defense, and being informed by the solicitor for the State that he would ask for a verdict of guilty of murder in the first degree, thereupon, appointed as counsel for the defendant two reputable lawyers of the New Hanover County Bar, to wit: Alan A. Marshall and W. F. Jones, and informed them of their appointment, the same being accepted. The court further finds that at 2:30 p.m., on the 14th day of November, 1938, the defendant was arraigned in open court, and for his plea to the bill of indictment entered a plea of not guilty, which plea was made in his own proper

person and by his attorneys, each standing by his side. The court further finds as a fact that the cause was then set for trial at 2:30 the following day, Tuesday the 15th, and upon the agreement of counsel for the State and for the defense that seventy-five names would be sufficient to constitute a special venire to serve as jurors in this case in addition to the regular panel, if such regular panel should become exhausted, and thereupon a child under the age of ten years, to wit, Horace Thomas Chinnis, drew the names from the jury box of the county in accordance with the law, in the presence of the defendant and of his counsel; that at the commencement of the afternoon session, 2:30 p.m., November 15, 1938, the defendant's counsel filed a plea in abatement, which plea in abatement is supported by an affidavit signed by Thomas Woody. The court further finds as a fact that the affidavit supporting the plea of abatement does not disclose to the court that there are not now in the jury box of New Hanover County the names of colored citizens of the county, but, to the contrary, shows that two years ago a number of names of the Negro race were placed in such jury box, and the court finds that the names of members of the Negro race of New Hanover County have been, within the last two years, placed in the jury box of New Hanover County. The motion of plea in abatement is not allowed by the court, in its discretion, and the same is hereby overruled."

In *S. v. Walls,* 211 N. C., 487 (494), speaking to the subject, it is said: "The exclusion of all persons of the Negro race from a grand jury, which finds an indictment against a Negro, where they are excluded solely because of their race or color, denies him the equal protection of the laws in violation of the Constitution of N. C., and the United States. *S. v. Peoples,* 131 N. C., 784." *Strauder v. W. Va.,* 100 U. S., 303, 25 L. Ed., 664; *Neal v. Del.,* 103 U. S., 370, 26 L. Ed., 567; *Norris v. Ala.,* 294 U. S., 587, 55 S. Ct., 578 (1933) (second Scottsboro case).

There was some evidence to sustain the above finding of fact made by the court below. It has been generally held by this court that the findings of fact are conclusive on appeal in the absence of gross abuse. *S. v. Walls, supra,* p. 494. The *Walls case, supra,* on appeal to the U. S. Supreme Court, was dismissed, 302 U. S., 635, 58 S. Ct., 18.

In *Thomas v. Texas,* 212 U. S., 278, 53 L. Ed., 512, it is said: "Whether such discrimination was practiced in this case was a question of fact and the determination of that question adversely to plaintiff in error by the trial court and by the court of criminal appeals was decisive so far as this Court is concerned, unless it could be held that this decision constituted such abuse as amounted to an infraction of the Federal Constitution."

The following motion was made by defendant on 15 November, 1938: "Now comes the defendant, James Henderson, charged with the crime

of murder in the first degree, through his counsel, Alan A. Marshall and W. F. Jones, and respectfully moves this honorable court that the trial of this cause be continued, for that: The defendant was apprehended and placed in custody on or about the 8th day of November, 1938, and since that time has been held incommunicado by the law enforcement officers of the city of Wilmington and New Hanover County and the State of North Carolina, and that shortly after the 8th day of November, 1938, the said defendant was removed to the State Prison in Raleigh, North Carolina, and was confined there until the 14th day of November, at which time he was returned to the city of Wilmington, North Carolina, arriving in Wilmington, North Carolina, in the custody of several officers at or about noon on the 14th day of November, 1938, and that about 10:30 a.m., on the 14th day of November, 1938, the Honorable W. H. S. Burgwyn, judge presiding, informed Alan A. Marshall that he was going to appoint the said Marshall to represent the said defendant and requested him to be present at 2:30 on that day, at which time the defendant would be arraigned, whereupon the said Alan A. Marshall prayed the court to appoint another attorney to assist him in the presentation of the defense of the said James Henderson, which prayer was granted by the court; that at or about 2:30 on the 14th day of November, Alan A. Marshall and W. F. Jones presented themselves before the court, and for the first time saw the defendant, James Henderson, in court. The defendant was arraigned and pleaded 'Not guilty,' whereupon the court instructed the court reporter to let the records show that Alan A. Marshall and W. F. Jones were thereby appointed to represent the defendant and as counsel for the defendant have not had sufficient time in which to discuss the case with the client to investigate the facts and the law applicable to the cause, and, in brief, have not, in their opinion, had sufficient time in which to properly prepare the case for the defendant and present his defense in an adequate way as the said defendant is entitled to by law."

"The court finds as a fact that immediately after the arraignment of the defendant the court requested the solicitor for the State to give to the counsel for the defendant the names of each and every witness for the State whom they might have a desire to examine. Whereupon, the solicitor did give to the counsel for the defendant the names of the witnesses, and other evidence in writing which he proposes to introduce against the defendant, and the court now asks the defendant's counsel if there is anyone in the State of North Carolina they desire as a witness in this case. (Mr. Marshall): 'So far as we know there is no specific witness, or no specific information. Therein lies the point of our motion for continuance. We feel, and respectfully submit to your Honor, that we have not had time (barely twenty-four hours as a matter

of fact) to talk, first to this man; to talk to the witnesses whom he has given us, and to delve into the law applicable to the case, and attempt to present his case in an adequate way. Lack of time for the disclosure of information materially goes to the soul of our motion.' (Court:) Upon the completion of the selection of the jury tonight, if you desire further time, I will continue the trial of the case until morning for you. . . . Let the record show that after the jury has been selected, sworn and impaneled, counsel for the defendant signified their readiness to proceed."

"This Court has wisely left the matter in the sound discretion of the court below unless there is 'palpable abuse' or 'gross abuse' of this discretion. This Court in a most thorough opinion, citing a wealth of authorities, said in *S. v. Sauls,* 190 N. C., 810 (813): 'It was subsequently held in a number of decisions that the refusal to continue a case rests in the judge's discretion upon matters of fact which this Court has no power to review. . . . In other cases it is held that while the exercise of discretion must be judicial and not arbitrary it is not subject to review unless "the circumstances prove beyond doubt hardship and injustice," . . . "palpable abuse" . . . or "gross abuse" . . .' *S. v. Rhodes,* 202 N. C., 101 (102-3); *S. v. Lea,* 203 N. C., 13 (24); *S. v. Garner,* 203 N. C., 361; *S. v. Banks,* 204 N. C., 233 (237); *S. v. Whitfield,* 206 N. C., 696 (698)." *S. v. Godwin, ante,* 49.

The record discloses that the court below was right in its discretion in refusing a continuance. The defendant confessed to the crime and had numerous witnesses to testify as to his drinking that night. If the case had been continued it would not have advantaged defendant. The charge of the court below is not in the record and the presumption of law is that the court fairly charged every phase of the law applicable to the facts, including that of intoxication affecting defendant's capacity to form sufficient intent to kill the deceased with premeditation and deliberation with malice aforethought. The defendant in his testimony said, "The officers explained she was hit and I said, 'I must have did it.' I didn't deny hitting her and I still don't." The facts in the record against the defendant are sordid and repulsive—all the evidence indicates that while drinking defendant raped the deceased and brutally murdered her with a lug wrench, wounds were on her head and elsewhere on her person. If the jury had been composed entirely of persons of the Negro race, from the evidence the verdict could not have been otherwise.

On this record there is no prejudicial or reversible error.

No error.