STATE OF NORTH CAROLINA v. JACKIE TYRONE COLSON.

(Filed 30 September, 1964.)

**1. Criminal Law § 121; Indictment and Warrant § 4—**

Motion in arrest of judgment lies only for defect of the record proper, and is inappropriate to present the contention of irregularity in proceedings before the grand jury.

**2. Indictment and Warrant §§ 4, 15—**

A plea in abatement or motion to quash the indictment is the proper procedure to present the contention that the solicitor was in the grand jury room and procured the finding of the indictment.

**8. Indictment and Warrant § 14—**

Plea in abatement and motion to quash the indictments for irregularity in the proceedings before the grand jury are addressed to the discretion of the court when not made until after conviction, and the exercise of such discretion by the court ordinarily is not reviewable on appeal.

**4. Criminal Law § 167—**

The findings of fact by the trial court upon the hearing of defendant's plea in abatement and motion to quash the indictments for alleged irregularities before the grand jury are conclusive on appeal when supported by competent evidence unless so grossly wrong as to amount to denial of due process.

**5. Indictment and Warrant § 4—**

While it is improper for the solicitor to be present in the grand jury room while the grand jury is deliberating and voting on indictments, the presence of the solicitor in the grand jury room at a time other than when the grand jury is deliberating and voting on indictments, for the purpose of advising them on questions of law will not warrant quashal in the absence of prejudice to the defendant.

**6. Same; Indictment and Warrant § 15— Findings held to support conclusion that presence of solicitor in grand jury room was not prejudicial.**

Evidence that in response to the grand jury's request the solicitor was present in the grand jury room for the purpose of advising them on questions of law, but that he was not present while they were examining witnesses or voting on the indictments in question, that he advised them in regard to their duty to determine the question of probable cause but not the question of guilt or innocence, that he correctly stated twelve affirmative votes were required for a finding of a true bill, that it was necessary to examine all witnesses named on an indictment before returning it not a true bill, and that their finding that the bill in question was not a true bill would not necessarily end the matter as he could, and probably would, send another bill, *is held*, under the facts and circumstances of this case, together with other findings by the court, to sustain the conclusion of the court that defendant was not prejudiced by the presence of the solicitor in the grand jury room.

**7. Indictment and Warrant § 4—**

The grand jurors' oath of secrecy does not preclude the court, when the ends of justice so require; from calling grand jurors to testify in respect to a charge that the solicitor influenced their proceedings, and the court properly interrogates them in regard to the matter and properly permits counsel to ask competent questions in regard thereto. G.S. 11-11.

**8. Criminal Law § 98—**

While discharging its duty to find the facts upon motion to quash indictments on the ground that the solicitor was in the grand jury room during the grand jury's deliberations, it is for the court to find the ultimate issues when different inferences can be drawn from the evidence.

**9. Criminal Law § 99—**

On motion to nonsuit, the evidence is to be considered in the light most favorable to the State, and the State is entitled to every reasonable intendment thereon and every reasonable inference therefrom, and defendant's evidence is not to be considered except to the extent it is favorable to the State.

**10. Negligence § 31—**

Culpable negligence in the law of crimes implies something more than actionable negligence in the law of torts, and is such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others.

**11. Same—**

If culpable negligence proximately causes death, the actor is guilty of manslaughter, and, under some circumstances, of murder.

**12. Same—**

The wilful, wanton or intentional violation of a safety statute or the unintentional or inadvertent violation of such statute which is accompanied by recklessness or a thoughtless disregard of probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, constitutes culpable negligence.

**13. Automobiles § 59— Evidence of culpable negligence in striking boys on highway held for jury.**

The evidence tended to show that a bus stopped on the right side of the highway with its right wheels on the shoulder for passengers to alight, that the driver looked in his rear view mirror and saw no vehicle approaching from his rear, opened the door of the bus and permitted passengers to alight, that a nine year old and a six year old boy were among the passengers to alight, that the boys ran in front of the bus and started across the highway and were struck and fatally injured by the car driven by defendant, which approached from the rear of the bus. The evidence further tended to show that there was nothing to obstruct defendant's view of either side of the bus as he approached, that, according to his own testimony, he approached at a speed of 55 to 60 miles per hour and did not sound his horn, and that he was indifferent to the conditions and con-

tinued on at the same speed until he saw the boys come from in front of the bus and start across the highway, when he applied his brakes, etc. *Held:* The evidence is sufficient to show a wilful, wanton and intentional violation of G.S. 20-140 or, if such violation was unintentional, that defendant's failure to keep a proper lookout and failure to give any signal under the circumstances was accompanied by such recklessness of the probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, as to amount to culpable negligence, and defendant's motion to nonsuit the charge of manslaughter was properly denied.

**14. Automobiles § 38—**

Witnesses having a reasonable opportunity to observe and judge the speed of a car may testify as to their opinion of such speed.

**15. Same; Appeal and Error § 41—**

The admission of testimony of a witness that defendant's car was "moving pretty fast" is not prejudicial even though the witness had no reasonable opportunity to judge the speed of defendant's car when defendant himself testifies that he was traveling between 55 and 60 miles per hour.

**16. Automobiles § 60—**

In this manslaughter prosecution, the charge *is held* to have properly instructed the jury on the question of death by accident or misadventure.

**17. Same —**

"Reasonable prevision" and "reasonable foreseeability" have substantially the same significance when applied to the question of proximate cause in a manslaughter prosecution, and therefore the use of the phrase "reasonable prevision" instead of "reasonable foreseeability" in charging upon the element of proximate cause, is not prejudicial.

**18. Automobiles § 61—**

The acquittal of defendant on charges of speeding and the conviction of defendant of manslaughter are not incongrous when the State in regard to the manslaughter charge relies not only on excessive speed but also upon failure to maintain a reasonable lookout and reckless driving amounting to a heedless disregard of the probable consequences of a dangerous nature, when tested by the rule of reasonable prevision.

APPEAL by defendant from *Morris, J.,* September 1963 Session of CAMDEN.

Defendant was convicted on an indictment charging him with manslaughter in respect to the death of Custer Lee Roach, on another indictment charging him with manslaughter in respect to the death of Rufus Roach, Jr., was acquitted on the first count of a third indictment charging him with driving an automobile upon a public highway at a rate of speed in excess of 75 miles an hour in a 60-mile-an-hour speed zone, and on the third count of the same indictment charging him with operating an automobile on a public highway at a speed greater

than was reasonable and prudent and in excess of 60 miles an hour in a 60-mile-an-hour speed zone. At the close of the State's evidence, the court directed a verdict of not guilty on the charge in the second count of the same indictment charging him with operating an automobile upon a public highway with an improper registration card. The various indictments were consolidated for trial.

From a prison sentence imposed on each conviction for manslaughter to run concurrently, defendant appeals.

*Attorney General T. W. Bruton, Assistant Attorney General Ray B. Brady, and Staff Attorney L. P. Hornthal, Jr., for the State.*

*LeRoy, Wells & Shaw by Dewey W. Wells and J. H. LeRoy for defendant appellant.*

PARKER, J.  The jury returned its verdict of guilty about midnight on 26 September 1963 on the manslaughter indictments, and the court that night imposed sentences of imprisonment. At 9:45 a.m. on the following morning, defendant filed with the trial judge what he terms a "plea in abatement, motion in arrest of judgment, and motion to quash the indictments, Indictments Nos. 245 and 246 — Manslaughter," based upon two grounds:

> "1.  While the grand jury was discussing and deliberating upon the aforesaid bills of indictment the Solicitor of the First Judicial District visited the grand jury room and remained therein during said deliberations and discussions; that the Solicitor suggested and explained to the grand jury the testimony or probable testimony of witnesses, and the Solicitor advised and procured the action of the grand jury in finding a true bill, as supported by the affidavits furnished at the time of filing this motion.

> "2.  That the facts connected with this motion have come to the attention of the defendant subsequent to the trial, conviction and entry of judgments herein. That judgment was pronounced in the above-entitled action between 11:00 and 12:00 P.M. on the night of September 26, 1963, and these motions are filed the following morning as soon as the Court's attention could be obtained."

The solicitor for the State answered defendant's plea and motions denying section 1 thereof, and on information and belief denying the first sentence of section 2 thereof, and admitting the second sentence of section 2 thereof, both of which sections are set forth above.

Judge Morris heard defendant's plea in abatement, motion in arrest of judgment, and motion to quash the manslaughter indictments on an

affidavit offered by defendant signed by seven of the grand jurors who were members of the grand jury that found and returned these indictments as true bills; upon an affidavit by the foreman of this grand jury and an affidavit by the solicitor for the State offered by the State; and upon oral testimony of the seven grand jurors who signed the affidavit offered by defendant. Judge Morris on his own motion had these seven grand jurors subpoenaed. He examined each one of them and permitted counsel for the State and defendant to examine each one of them, which they did.

After hearing and considering this evidence, Judge Morris made findings of fact, the crucial ones of which we summarize, except when quoted (the numbering of paragraphs is ours):

1. During a brief recess in the trial of a case on the afternoon of the first day of the September 1963 Session of the superior court of Camden County, the foreman of the grand jury at that session of court approached the solicitor and stated to him that the grand jury requested that he come to their room. Prior to this request by the grand jury, the grand jury had examined witnesses in indictments Nos. 245 and 246 charging the defendant with manslaughter, had discussed and deliberated on the evidence, and had taken a vote, and 14 members of the grand jury had voted for a true bill.

2. Upon entering the grand jury room, the solicitor was asked what evidence and how many votes were required in order to return a true bill of indictment. In reply to the question, the solicitor reminded them that the court had already instructed them that their duty was not to determine the guilt or innocence of any defendant named in an indictment, but that they were to be satisfied from evidence before them that there was probable cause to believe that the crime set forth in an indictment had been committed by the person or persons named as defendants in the bill, and that it required 12 affirmative votes of their body in order to return a true bill. That it was necessary to examine all the witnesses named on an indictment before returning it not a true bill. In response to a question as to how many votes for a true bill it would take to make a true bill, the solicitor answered, "twelve"; he never said, "majority." When he had opened the door and started to leave the room, a juror asked the solicitor this question: "If we should return not a true bill, would that end the matter?" The solicitor replied: "Not necessarily, as I could send another bill and probably would." Immediately thereafter the solicitor left the grand jury room and returned to the courtroom.

3. The solicitor was in the grand jury room less than five minutes. The solicitor did not influence the grand jury in the finding of a true bill of indictment. The solicitor was not in the grand jury room while the grand jurors were examining the witnesses and hearing testimony. He was not in the grand jury room when the grand jurors were deliberating and discussing the testimony of witnesses. He was not in the grand jury room when the grand jurors were voting on the bills of indictment. He did not suggest and explain to the grand jury the testimony or probable testimony of witnesses. He did not advise and procure the action of the grand jury in finding a true bill.

4. Before or during the trial, it was generally discussed among the crowds in and around the courthouse that the solicitor had been into the grand jury room. The court personally observed that defendant's father sat with defendant and his counsel throughout the trial. Within an hour after the verdict in this case was rendered and judgment imposed, defendant's father was at the home of some of the grand jurors, stated that he knew the solicitor had been to the grand jury room, and made inquiry concerning the same. He made a request of Paul De-Berry, one of the grand jurors, to meet him and defendant's attorney, and sign an affidavit. DeBerry, before or during the trial, received information that the solicitor was not supposed to go into the grand jury room.

5. One of the grand jurors who signed defendant's affidavit stated that the solicitor's affidavit is absolutely correct, and that the affidavit which he signed was misleading. Another grand juror who signed defendant's affidavit did not read it, had no knowledge of what it contained, and would not have signed it if he had known its contents. Several of the grand jurors had their names stricken from defendant's affidavit.

Based upon his findings of fact, Judge Morris made the following legal conclusions:

"1. The defendant was not prejudiced in any respect by the presence of the Solicitor in the Grand Jury Room or by anything that occurred while he was in the Grand Jury Room.

"2. There is no sufficient cause for abatement or for arrest of judgment or for quashal of the indictments."

Whereupon, Judge Morris entered an order denying defendant's plea in abatement, motion in arrest of judgment, and motion to quash the indictments.

A motion in arrest of judgment is not the proper procedure to endeavor to invalidate the indictments here on the alleged ground that the

solicitor was in the grand jury room and procured the finding of the indictments, for the reason that the motion is based on matters which do not appear on the face of the record proper, or on matters which should, but do not, appear on the face of the record proper. *S. v. Gaston,* 236 N.C. 499, 73 S.E. 2d 311. The proper procedure in such case is by plea in abatement or motion to quash the indictments. *S. v. Ledford,* 203 N.C. 724, 166 S.E. 917; *S. v. Crowder,* 193 N.C. 130, 136 S.E. 337; *S. v. Branch,* 68 N.C. 186.

Defendant's plea in abatement and motion to quash the indictments were made after a plea of not guilty, and after a conviction and judgment on the conviction. Whether a plea in abatement shall be allowed, or a motion to quash entertained, after the plea of not guilty has been entered are matters addressed entirely to the discretion of the court. The exercise of such discretion is not reviewable on appeal. *S. v. Jones,* 88 N.C. 671; *S. v. Burnett,* 142 N.C. 577, 55 S.E. 72; *S. v. Pace,* 159 N.C. 462, 74 S.E. 1018; *S. v. Gibson,* 221 N.C. 252, 20 S.E. 2d 51; *S. v. St. Clair,* 246 N.C. 183, 97 S.E. 2d 840. It is clear that the learned trial judge exercised his discretion in entertaining defendant's plea in abatement and motion to quash the indictments.

The findings of fact of Judge Morris are conclusive on appeal, if supported by competent evidence, unless so grossly wrong as to amount to a denial of due process. *S. v. Wilson,* 262 N.C. 419, 137 S.E. 2d 109; *S. v. Perry,* 250 N.C. 119, 108 S.E. 2d 447; *S. v. Henderson,* 216 N.C. 99, 3 S.E. 2d 357.

Judge Morris's crucial findings of fact and the inferences reasonably to be drawn therefrom are amply supported by competent evidence in the record before us. A study of this evidence makes it manifest that there was no ill-consideration of it by him in making his findings of fact. Defendant's exceptions to his findings of fact are overruled.

Our decisions discountenance the solicitor for the State going into the grand jury room during the sessions of the grand jury, and hold that it is improper for him to influence, or to attempt to influence, the grand jury's action or decision. *S. v. Crowder, supra; Lewis v. Comrs.,* 74 N.C. 194. See concurring opinion of *Connor, J.,* in *S. v. Lewis,* 142 N.C. 626, 55 S.E. 600. However, it seems to be the generally prevailing rule in most jurisdictions that, except where there is a rule or statute otherwise, the prosecuting attorney may appear before the grand jury in his official capacity, and assist them in their investigation and advise them on questions of law; but he is not as a general rule permitted to be present during the deliberations and voting of the grand jury. Annotation entitled "Presence in grand jury room of person other than grand juror as affecting indictments," 4 A.L.R. 2d 392, 400; 4 Wharton's

Criminal Law and Procedure, Anderson, sec. 1716, p. 478; 38 C.J.S., Grand Juries, sec. 40(b), p. 1041.

In the *Crowder* case, the Court held that the indictments should have been quashed when it was made to appear that the solicitor was present in the grand jury room, explained the testimony to the grand jury, and advised and procured their action in finding true bills. However, in its opinion the Court used this significant language: "Nevertheless, we should be loath to hold that the mere presence of the solicitor in the grand jury room constitutes sufficient cause for abatement in the absence of some evidence of conduct or speech apparently prejudicial to the accused, or to suffer a bare unsubstantial technicality to defeat the administration of justice."

In the Annotation in 4 A.L.R. 2d 392, 395, it is said:

"Although it appears well established that an indictment returned by a grand jury will be quashed or abated where the presence of an authorized person during the grand jury proceedings results in prejudice to the accused, there is a decided difference of opinion as to whether the mere presence of an unauthorized person, without a showing of prejudice, is a sufficient ground to set aside the indictment.

"The prevailing view, apart from statutes expressly affecting the question, is that the presence of an unauthorized person during grand jury proceedings is, at most, a mere irregularity, not sufficient to constitute a ground for setting aside the indictment returned by the grand jury, unless prejudice to the accused is shown."

This annotation cites *S. v. Crowder, supra*, in support of its statement as to the prevailing view. See also in this annotation secs. 6 through 16. See also 4 Wharton's Criminal Law and Procedure, Anderson, sec. 1715.

Although what is quoted above from the *Crowder* case is *obiter dictum*, it seems to be a strong expression of opinion by the members of the then Court that it would not hold that the presence of the solicitor in the grand jury room would necessarily result in an invalidation of an indictment returned by the grand jury. We think it is sound law, which we adopt in this jurisdiction, and which is consistent with the prevailing view in most other jurisdictions, apart from jurisdictions with statutes affecting the question, that the presence of the solicitor in the grand jury room at a time other than when the grand jury was deliberating and voting on an indictment is not sufficient to constitute

a ground for invalidating the indictment, "in the absence of some evidence of conduct or speech apparently prejudicial to the accused."

Judge Morris's findings of fact are to this effect: Prior to the solicitor's going into the grand jury room at the grand jury's request, the grand jury had examined witnesses in the manslaughter indictments here challenged, had discussed and deliberated on the evidence, had taken a vote, and 14 members of the grand jury had voted for a true bill. When he entered the grand jury room, he was asked what evidence and how many votes were required in order to return a true bill of indictment. In reply he reminded them the court had already instructed them that their duty was not to determine the guilt or innocence of any defendant named in an indictment, but that they were to be satisfied from evidence before them that there was probable cause to believe that the crime alleged in the indictment had been committed by the person or persons named as defendants in the indictment, and that it required 12 affirmative votes of their body in order to return a true bill. This statement by the solicitor is a correct statement of the law in this jurisdiction. *S. v. Stewart,* 189 N.C. 340, 127 S.E. 260; *S. v. Barker,* 107 N.C. 913, 12 S.E. 115; *S. v. Davis,* 24 N.C. 153; *Ex parte Bain,* 121 U.S. 1, 30 L. Ed. 849; 4 Blackstone's Com. 303, pp. 1695-6; Criminal Procedure from Arrest to Appeal (The Judicial Administration Series), p. 144; 37 N. C. Law Review, Grand Jury, 292. In 4 Blackstone's Com. 306, p. 1699, which is quoted partially with approval in *S. v. Stewart, supra,* it is said: "But if twelve of the grand jury assent, it is a good presentment, though some of the rest disagree; and the indictment, when so found, is publicly delivered into court." It seems to us manifest that there was no danger that this correct statement of the law to the grand jury by the solicitor under the circumstances found as facts by Judge Morris might have affected the action of the grand jury, and that such statement by the solicitor was not prejudicial to the accused.

Judge Morris also found as a fact that the solicitor also told the grand jury that it was necessary to examine all the witnesses named in the indictment before returning it not a true bill. Under the facts found by Judge Morris, it is clear this statement could not have prejudiced the accused.

Judge Morris further found these facts: When the solicitor started to leave the grand jury room, a grand juror asked him: "If we should return not a true bill, would that end the matter?" The solicitor replied. "Not necessarily, as I could send another bill and probably would." Judge Morris found as a fact that before the solicitor, at the grand jury's request, entered the grand jury room, the grand jury had

examined witnesses in the manslaughter indictments challenged here, had discussed and deliberated on the evidence, had taken a vote, and 14 members of the grand jury had voted for a true bill. Twelve members of the grand jury could find the manslaughter indictments here true bills, even though some of the rest of the grand jury disagreed. It seems plain that there was no danger under such circumstances that the reply of the solicitor to the question influenced the action of the grand jury, and that such reply by the solicitor was not prejudicial to the accused.

Judge Morris further found as facts that the solicitor was in the grand jury room less than five minutes; that he was not in the grand jury room while the grand jurors were examining the witnesses and hearing testimony, and while the grand jurors were deliberating and discussing the testimony and were voting on the bills of indictment; that he did not suggest and explain to the grand jury the testimony or probable testimony of witnesses; that he did not influence the grand jury in the finding of the manslaughter indictments; and that he did not advise and procure the action of the grand jury in finding a true bill.

In our opinion, and we so hold, the findings of fact by Judge Morris amply support his legal conclusions that the defendant was not prejudiced in any respect by the presence of the solicitor in the grand jury room, and that there is no sufficient cause for abatement or for arrest of judgment or for quashing the manslaughter indictments, and that his findings of fact and conclusions of law support his order denying defendant's plea in abatement and motions.

At the hearing of defendant's plea in abatement and of his motions in arrest of judgment and to quash the manslaughter indictments here, he offered an affidavit signed by seven members of the grand jury that found these indictments true bills. If the facts stated in defendant's plea in abatement and motions and the supporting affidavit were true, defendant was prejudiced, and the indictments of manslaughter here should be invalidated. At this hearing, Judge Morris had before him an affidavit by the foreman of the grand jury and an affidavit by the solicitor controverting the statements of fact in defendant's plea in abatement and motions and in the supporting affidavit. Under such circumstances, it is manifest that Judge Morris was of opinion that the ends of justice required that there should be an oral examination by himself, and by counsel for the State and counsel for the defendant, of the seven grand jurors who signed the affidavit offered by defendant. Judge Morris examined each one of these grand jurors and permitted counsel for the State and for the defendant to examine each one of

them, which they did. Defendant has numerous assignments of error to questions asked these witnesses by Judge Morris and to the admission in evidence of some of their testimony elicited by Judge Morris and also by counsel.

This Court as far back as 1846 held in *S. v. Broughton,* 29 N.C. 96, 45 Am. Dec. 507, a leading opinion that has since been cited with approval in many other jurisdictions, that a grand juror, on the trial of an indictment, may be compelled to disclose what was given in evidence by a witness before the grand jury. The tendency of modern decisions has been to hold that the grand jurors' oath of secrecy (G.S. 11-11) does not prohibit the disclosure in court of proceedings before the grand jury whenever the ends of justice require it. 4 Wharton's Criminal Law and Procedure, Anderson, p. 494; Stansbury's N. C. Evidence, sec. 64.

Under the circumstances, and the applicable law, the experienced and learned trial judge committed no error when on his own motion he called the seven grand jurors to the stand to testify in respect to what the solicitor said and did in the grand jury room, for the simple reason that he acted in furtherance of and according to the requirements of justice. We have carefully examined all the defendant's assignments of error in respect to the questions asked these grand jurors by Judge Morris and to the challenged evidence admitted, and all are overruled, for the reason no prejudicial error appears. As to the law applicable to a judge sitting without a jury and finding facts, and when different inferences can be drawn from the evidence, the ultimate issue is for the judge, see *Bizzell v. Bizzell,* 247 N.C. 590, 101 S.E. 2d 668; *Turnage Co. v. Morton,* 240 N.C. 94, 81 S.E. 2d 135; *Trust Co. v. Lumber Co.,* 221 N.C. 89, 19 S.E. 2d 138.

Defendant assigns as error the denial of his motion for judgment of compulsory nonsuit made at the close of all the evidence offered by the State and by himself. G.S. 15-173; *S. v. Leggett,* 255 N.C. 358, 121 S.E. 2d 533. It is familiar learning that on a motion for judgment of compulsory nonsuit the State is entitled to have the evidence considered in its most favorable light, and the State is entitled to every reasonable intendment thereon and every reasonable inference therefrom, and that defendant's evidence, unless favorable to the State, is not to be considered, except when not in conflict with the State's evidence, it may be used to explain or make clear the State's evidence. *S. v. Roop,* 255 N.C. 607, 122 S.E. 2d 363; Strong's N. C. Index, Vol. 1, Criminal Law, § 99. Applying such rule in considering defendant's motion for a judgment of compulsory nonsuit, the State's evidence tends to show the following facts:

About five o'clock on the afternoon of 2 July 1963, Charlie Rucker was operating a GMC passenger bus loaded with farm laborers on N. C. Highway 343 between Camden and South Mills, traveling in the direction of South Mills, in open country where the speed limit was 60 miles an hour. The hard-surfaced part of the highway was 20 to 22 feet wide, with dirt shoulders on each side. Among the passengers on the bus were Custer Lee Roach, age nine years, Rufus Roach, Jr., age six years, and two of their older sisters. The two boys were with their sisters merely to be away from home for the day.

When the bus approached the Roach home, Rucker looked in his rear-view mirror, saw no vehicle approaching from his rear, and stopped the bus on the opposite side of the highway from the Roach home, with his left wheels on the hard-surfaced part and his right wheels on the dirt shoulder. He opened the door of the bus, and the two Roach girls and the two Roach boys got out on the dirt shoulder. At this time Rucker looked again in his rear-view mirror, saw an automobile approaching him from the rear, and heard it skidding. The two boys went in front of the bus and started across the highway to their home. When they had reached the center of the highway or about three feet across the center in the direction of their home, they were struck and killed by an automobile driven by defendant, which approached the bus from its rear traveling in the direction of South Mills.

Defendant was traveling at a rate of speed of over 75 to 80 miles an hour, or 80 to 90 miles an hour, or between 85 and 90 miles an hour, according to the testimony of various eye witnesses. The boys were hit and picked up by the hood of defendant's automobile and carried along the highway until the automobile hit a ditch, where the bodies were thrown off or fell off. A highway patrolman arrived at the scene a few minutes after the boys were killed. He saw skid marks in the left lane of traffic for a person traveling towards South Mills that began 94 feet behind the front of the bus and continued to the front of the bus, and then continued 150 feet to the right side of the highway, and then there were tracks of tires and wheels to where the automobile went off the highway into a ditch embankment, across a ditch into a field 202 more feet, where defendant's automobile was stopped. At the scene defendant told the highway patrolman that he had been driving 80 to 90 miles an hour for three or four miles back up the highway, and that "he was driving at the time of the accident right at 60 m.p.h."

At the scene Barbara Roach, a sister of the dead Roach boys, asked defendant: "Didn't you see the children? Didn't you see the bus?" She testified: "He cussed me. He said he didn't see it, said he didn't see the

g .. damn bus, neither the children, and he asked me why we didn't keep our damn children in the yard." Alice Marie Trotman, an aunt of the dead Roach boys, at the scene went over to ask the defendant did he see the bus stop. She testified: "I was in the crowd where they all ask if he saw the bus stop or see the children and he said he didn't see the 'g .. d ... bus,' and we 'ought to have kept our g .. d ... children in the yard.' I was there when Barbara Roach was there in the group."

Defendant's testimony tends to show the following: He is 18 years old. When he first saw the bus, it was parked on the right shoulder, completely off the highway. He saw no one in the bus. The bus displayed no signals. He was traveling 55 to 60 miles an hour in a 60-mile speed zone. He did not sound his horn. He drove into the left lane to pass the bus. When he first saw the Roach boys, they came out from in front of the bus and started across the highway, one behind the other. When he first saw them, he "hit" his brakes. He tried to avoid hitting them by swerving to the right. After he hit the children, when they were about half way across the left lane, he eased off his brakes to keep control of his automobile. He never said he did not see the bus or the children, and he used no profanity at the scene.

Defendant on cross-examination testified in part: "I saw the bus on the highway about a quarter of a mile from the bus. I could not tell if it was stopped or not * * *. I decided that the bus was not moving when I got almost to it, by which I mean about five or six car-lengths behind it. There was nothing to prevent me from seeing that it wasn't moving before I got within five or six car-lengths of it. The bus was completely on the pavement. There was a shoulder some 8 to 10 feet wide on its right side. * * * There was nothing to obstruct my view on either side of the bus as I approached it some quarter of a mile away. I saw that it was a bus, and I was familiar with the fact that there were labor buses in the general area at that time or season, hauling laborers that were put off or either taken on, depending upon the time of day, at various places along the way." On cross-examination, defendant was asked these questions: "You were indifferent to the conditions there existing? It didn't make no difference to you about the bus being there; you just continued on with the same speed?" He replied: "Yes, sir."

Culpable negligence, from which death proximately ensues, makes the actor guilty of manslaughter, and under some circumstances guilty of murder. *S. v. Cope,* 204 N.C. 28, 167 S.E. 456; *S. v. Phelps,* 242 N.C. 540, 89 S.E. 2d 132; *S. v. Roop, supra.*

Culpable negligence in the law of crimes necessarily implies something more than actionable negligence in the law of torts. *S. v. Stansell,*

203 N.C. 69, 164 S.E. 580; *S. v. Cope, supra; S. v. Becker,* 241 N.C. 321, 85 S.E. 2d 327.

The Court said in *S. v. Cope, supra:* "Culpable negligence is such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others."

This Court speaking by the present Chief Justice said in *S. v. Hancock,* 248 N.C. 432, 103 S.E. 2d 491: "The violation of a safety statute which results in injury or death will constitute culpable negligence if the violation is wilful, wanton, or intentional. But, where there is an unintentional or inadvertent violation of the statute, such violation standing alone does not constitute culpable negligence. The inadvertent or unintentional violation of the statute must be accompanied by recklessness of probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, amounting altogether to a thoughtless disregard of consequences or of a heedless indifference to the safety of others."

In *S. v. Gash,* 177 N.C. 595, 99 S.E. 337, a chauffeur was convicted of the crime of manslaughter. The Court said: "Exception 6 is because the court charged the jury that if the defendant was operating the car lawfully and at the rate of speed permitted by law, yet if by reason of a failure to keep a proper lookout he failed to see the deceased in time to avoid injuring him, and 'by reason of his carelessness and negligence in failing to keep this lookout' he caused the death of the child, he was guilty. Upon the evidence for the State this failure to keep a lookout was due to the defendant turning his head and looking back to talk to a colored boy on the sidewalk. In this charge, there was no error."

The State's evidence and the reasonable inferences to be drawn therefrom, and defendant's evidence favorable to the State, would permit a jury to find that there was nothing to obstruct defendant's view on either side of the bus parked partially on the highway ahead of him as he approached it some quarter of a mile away, driving his automobile without keeping a proper lookout to see if persons were getting off the bus and, according to his testimony, without sounding his horn as he approached the bus driving at a speed of 55 to 60 miles an hour; that such operation of his automobile constituted a wilful, wanton or intentional violation of G.S. 20-140, a safety statute designed to prevent injury to persons or property and prohibiting the careless and reckless driving of automobiles on the public highways, and was culpable negligence; and that such culpable negligence proximately caused the death of the two Roach boys, and the defendant was guilty of manslaughter as charged in both indictments. Or, if defendant's violation of G.S. 20-

140 was inadvertent and unintentional, his operation of his automobile under the attendant circumstances at 55 to 60 miles an hour without keeping a proper lookout and without giving any signal of his approach was accompanied by such recklessness of probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, as to amount altogether to a thoughtless disregard of consequences and a heedless indifference to the safety of others, and was culpable negligence which proximately caused the death of the two Roach boys, and defendant was guilty of manslaughter as charged in both indictments. That even if defendant, when he first saw the boys, applied his brakes and endeavored to avoid injuring them, his prior culpable negligence in the operation of his automobile under the attendant circumstances rendered it impossible for him to stop or control it, and prevent his striking and killing them as a proximate result of his culpable negligence. That defendant's reckless and careless driving of his automobile imported a thoughtless disregard of consequences and his heedless indifference to the safety and rights of others is shown by his answer "Yes, sir" on cross-examination to the questions: "You were indifferent to the conditions there existing? It didn't make no difference to you about the bus being there; you just continued on with the same speed?" The trial court properly overruled defendant's motion for judgment of compulsory nonsuit.

Defendant assigns as error the testimony of Cora Roach, Barbara Roach, Alice Marie Trotman, and Josette Spence, all State's witnesses, as to the speed of defendant's automobile. All these assignments of error are overruled, for a reading of the testimony of each one of them shows that each one of them had a reasonable opportunity to judge the speed of defendant's automobile, and therefore the testimony of each one of them as to its speed was competent. *S. v. Fentress,* 230 N.C. 248, 52 S.E. 2d 795; *S. v. Becker, supra; S. v. Hart,* 250 N.C. 93, 107 S.E. 2d 919. Defendant also assigns as error the testimony of Charlie Rucker that the defendant's automobile "was moving pretty fast." Even though it appears that Rucker did not have a reasonable opportunity to judge the speed of defendant's car, yet its admission was harmless, for the reason that defendant testified on cross-examination that at the time of the accident he was running between 55 and 60 miles an hour. All other assignments of error as to the admission of evidence have been examined and are overruled.

Defendant contends that the court failed to clearly instruct the jury that a finding of unavoidable accident would require a verdict of not guilty. This assignment of error is overruled. The court instructed the jury at length and correctly as to what constituted a death caused by

accident or misadventure, and later on in the charge he instructed the jury that if they found from the evidence that the killing of the Roach boys was accidental or that it was a killing by misadventure, then it would be their duty to return a verdict of not guilty of involuntary manslaughter.

Defendant contends that the charge is fatally defective, because foreseeability of injury is a requisite of proximate cause, and that nowhere in the charge do the words "foreseeable" or "foreseeability" appear. It is true that these two words do not appear in the charge. However, the judge did charge "if you find from the evidence and beyond a reasonable doubt that * * * the defendant was inadvertently driving his car in violation of the statutes in such case made and provided and that such acts and conduct of the defendant were accompanied by recklessness or probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, amounting to a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others, then I charge you that the defendant would be guilty of culpable or criminal negligence," and then he went on to charge as to proximate cause. In this part of the charge Judge Morris used practically verbatim the language of this Court in S. v. Cope, supra, and in S. v. Hancock, supra. In both these cases the words "when tested by the rule of reasonable prevision" appear. The word "prevision" as a noun is defined in Webster's New International Dictionary, 2d edition: "Foresight; foreknowledge * * *." In the same dictionary, the word "prevision" as a transitive and intransitive verb is defined: "To foresee; to give or endow with prevision." The words "reasonable prevision" are substantially alike in meaning or significance with the words "reasonable foreseeability." S. v. Mundy, 243 N.C. 149, 90 S.E. 2d 312, relied upon by defendant, is clearly distinguishable, because in that case the charge did not state that the reckless driving must be the proximate cause of the wreck and resulting death. This contention and assignment of error of defendant is overruled.

All other assignments of error to the charge have been examined and are overruled. The charge is in substantial accord with the rules of law applicable to the facts as stated in the leading case of S. v. Cope, supra; S. v. Phelps, supra; S. v. Hancock, supra; in fact Judge Morris used almost verbatim many of the words used in the Cope case and the Hancock case. No error in the charge prejudicial to defendant's rights appears.

Defendant contends that the verdict of guilty of manslaughter on both indictments "is illogical and incongruous," because the jury acquitted defendant of speeding, that the "State's case was grounded on

unlawful speed," and therefore the verdict of guilty of manslaughter on both indictments should not be permitted to stand. The contention that the "State's case was grounded on unlawful speed" ignores a great part of the evidence in the record before us. The State's evidence, and defendant's evidence favorable to the State, tends to show defendant was guilty of culpable negligence in the operation of his automobile other than by speeding, which proximately caused the death of the Roach boys. This contention of defendant is untenable. *S. v. Mundy, supra; S. v. Midgett,* 214 N.C. 107, 198 S.E. 613.

All defendant's assignments of error have been examined and are overruled. In the trial below, we find no prejudicial error.

No error.