## STRAUDER *v.* WEST VIRGINIA.

1. The Fourteenth Amendment of the Constitution of the United States considered, and *held* to be one of a series of constitutional provisions having a common purpose; namely, to secure to a recently emancipated race, which had been held in slavery through many generations, all the civil rights that the. superior race enjoy, and to give to it the protection of the general government, in the enjoyment of such rights, whenever they should be denied by the States. Whether the amendment had other, and if so what, purposes, not decided.

2. The amendment not only gave citizenship and the privileges of citizenship to persons of color, but denied to any State the power to withhold from them the equal protection of the laws, and invested Congress with power, by appropriate legislation, to enforce its provisions.

3. The amendment, although prohibitory in terms, confers by necessary implication a positive immunity, or right, most valuable to persons of the colored race, — the right to exemption from unfriendly legislation against them distinctively as colored, — exemption from discriminations, imposed by public authority, which imply legal inferiority in civil society, lessen by security of their rights, and are steps towards reducing them to the condition of a subject race.

4. The statute of West Virginia, which, in effect, singles out and denies to colored citizens the right and privilege of participating in the administration of the law, as jurors, because of their color, though qualified in all other respects, is, practically, a brand upon them, and a discrimination against them which is forbidden by the amendment. It denies to such citizens the equal protection of the laws, since the constitution of juries is a very essential part of the protection which the trial by jury is intended to secure. The very idea of a jury is that it is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of persons having the same legal status in society as that which he holds.

5. Where, as here, the State statute secures to every white man the right of trial by jury selected from, and without discrimination against, his race, and at the same time permits or requires such discrimination against the colored man because of his race, the latter is not equally protected by law with the former.

6. Sect. 641 of the Revised Statutes, which declares that "when any civil suit or criminal prosecution is commenced in any State court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the State, or in the part of the State where such suit or prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States, . . . such suit or prosecution may, upon the petition of such defendant, filed in said State court, at any time before the trial or final hearing of the cause, stating the facts and verified by oath, be removed, for trial, into the next circuit court to be held in the district where it is pending," considered and *held* not to be in conflict with the Constitution of the United States.

ERROR to the Supreme Court of Appeals of the State of West Virginia.

The facts are stated in the opinion of the court.

*Mr. Charles Devens* and *Mr. George O. Davenport* for the plaintiff in error.

*Mr. Robert White*, Attorney-General of West Virginia, and *Mr. James W. Green, contra.*

MR. JUSTICE STRONG delivered the opinion of the court.

The plaintiff in error, a colored man, was indicted for murder in the Circuit Court of Ohio County, in West Virginia, on the 20th of October, 1874, and upon trial was convicted and sentenced. The record was then removed to the Supreme Court of the State, and there the judgment of the Circuit Court was affirmed. The present case is a writ of error to that court, and it is now, in substance, averred that at the trial in the State court the defendant (now plaintiff in error) was denied rights to which he was entitled under the Constitution and laws of the United States.

In the Circuit Court of the State, before the trial of the indictment was commenced, the defendant presented his petition, verified by his oath, praying for a removal of the cause into the Circuit Court of the United States, assigning, as ground for the removal, that "by virtue of the laws of the State of West Virginia no colored man was eligible to be a member of the grand jury or to serve on a petit jury in the State; that white men are so eligible, and that by reason of his being a colored man and having been a slave, he had reason to believe, and did believe, he could not have the full and equal benefit of all laws and proceedings in the State of West Virginia for the security of his person as is enjoyed by white citizens, and that he had less chance of enforcing in the courts of the State his rights on the prosecution, as a citizen of the United States, and that the probabilities of a denial of them to him as such citizen on every trial which might take place on the indictment in the courts of the State were much more enhanced than if he was a white man." This petition was denied by the State court, and the cause was forced to trial.

Motions to quash the *venire*, " because the law under which

it was issued was unconstitutional, null, and void," and successive motions to challenge the array of the panel, for a new trial, and in arrest of judgment were then made, all of which were overruled and made by exceptions parts of the record.

The law of the State to which reference was made in the petition for removal and in the several motions was enacted on the 12th of March, 1873 (Acts of 1872–73, p. 102), and it is as follows : " All white male persons who are twenty-one years of age and who are citizens of this State shall be liable to serve as jurors, except as herein provided." The persons excepted are State officials.

In this court, several errors have been assigned, and the controlling questions underlying them all are, first, whether, by the Constitution and laws of the United States, every citizen of the United States has a right to a trial of an indictment against him by a jury selected and impanelled without discrimination against his race or color, because of race or color ; and, second, if he has such a right, and is denied its enjoyment by the State in which he is indicted, may he cause the case to be removed into the Circuit Court of the United States ?

It is to be observed that the first of these questions is not whether a colored man, when an indictment has been preferred against him, has a right to a grand or a petit jury composed in whole or in part of persons of his own race or color, but it is whether, in the composition or selection of jurors by whom he is to be indicted or tried, all persons of his race or color may be excluded by law, solely because of their race or color, so that by no possibility can any colored man sit upon the jury.

The questions are important, for they demand a construction of the recent amendments of the Constitution. If the defendant has a right to have a jury selected for the trial of his case without discrimination against all persons of his race or color, because of their race or color, the right, if not created, is protected by those amendments, and the legislation of Congress under them. The Fourteenth Amendment ordains that " all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State wherein they reside. No State shall make or

enforce any laws which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

This is one of a series of constitutional provisions having a common purpose; namely, securing to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoy. The true spirit and meaning of the amendments, as we said in the *Slaughter-House Cases* (16 Wall. 36), cannot be understood without keeping in view the history of the times when they were adopted, and the general objects they plainly sought to accomplish. At the time when they were incorporated into the Constitution, it required little knowledge of human nature to anticipate that those who had long been regarded as an inferior and subject race would, when suddenly raised to the rank of citizenship, be looked upon with jealousy and positive dislike, and that State laws might be enacted or enforced to perpetuate the distinctions that had before existed. Discriminations against them had been habitual. It was well known that in some States laws making such discriminations then existed, and others might well be expected. The colored race, as a race, was abject and ignorant, and in that condition was unfitted to command the respect of those who had superior intelligence. Their training had left them mere children, and as such they needed the protection which a wise government extends to those who are unable to protect themselves. They especially needed protection against unfriendly action in the States where they were resident. It was in view of these considerations the Fourteenth Amendment was framed and adopted. It was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States. It not only gave citizenship and the privileges of citizenship to persons of color, but it denied to any State the power to withhold from them the equal protection of the laws, and authorized Congress to enforce its pro-

visions by appropriate legislation. To quote the language used by us in the *Slaughter-House Cases*, "No one can fail to be impressed with the one pervading purpose found in all the amendments, lying at the foundation of each, and without which none of them would have been suggested, — we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over them." So again: "The existence of laws in the States where the newly emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied, and by it [the Fourteenth Amendment] such laws were forbidden. If, however, the States did not conform their laws to its requirements, then, by the fifth section of the article of amendment, Congress was authorized to enforce it by suitable legislation." And it was added, "We doubt very much whether any action of a State, not directed by way of discrimination against the negroes, as a class, will ever be held to come within the purview of this provision."

If this is the spirit and meaning of the amendment, whether it means more or not, it is to be construed liberally, to carry out the purposes of its framers. It ordains that no State shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States (evidently referring to the newly made citizens, who, being citizens of the United States, are declared to be also citizens of the State in which they reside). It ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the

colored race, — the right to exemption from unfriendly legisla-
tion against them distinctively as colored, — exemption from
legal discriminations, implying inferiority in civil society, lessen-
ing the security of their enjoyment of the rights which others
enjoy, and discriminations which are steps towards reducing
them to the condition of a subject race.

That the West Virginia statute respecting juries — the
statute that controlled the selection of the grand and petit
jury in the case of the plaintiff in error — is such a discrimina-
tion ought not to be doubted. Nor would it be if the persons
excluded by it were white men. If in those States where the
colored people constitute a majority of the entire population
a law should be enacted excluding all white men from jury
service, thus denying to them the privilege of participating
equally with the blacks in the administration of justice, we
apprehend no one would be heard to claim that it would not
be a denial to white men of the equal protection of the laws.
Nor if a law should be passed excluding all naturalized Celtic
Irishmen, would there be any doubt of its inconsistency with
the spirit of the amendment. The very fact that colored
people are singled out and expressly denied by a statute all
right to participate in the administration of the law, as jurors,
because of their color, though they are citizens, and may be in
other respects fully qualified, is practically a brand upon them,
affixed by the law, an assertion of their inferiority, and a
stimulant to that race prejudice which is an impediment to
securing to individuals of the race that equal justice which the
law aims to secure to all others.

The right to a trial by jury is guaranteed to every citizen of
West Virginia by the Constitution of that State, and the con-
stitution of juries is a very essential part of the protection
such a mode of trial is intended to secure. The very idea of a
jury is a body of men composed of the peers or equals of the
person whose rights it is selected or summoned to determine;
that is, of his neighbors, fellows, associates, persons having
the same legal status in society as that which he holds. Black-
stone, in his Commentaries, says, " The right of trial by jury, or
the country, is a trial by the peers of every Englishman, and
is the grand bulwark of his liberties, and is secured to him by

the Great Charter." It is also guarded by statutory enactments intended to make impossible what Mr. Bentham called "packing juries." It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy. Prejudice in a local community is held to be a reason for a change of venue. The framers of the constitutional amendment must have known full well the existence of such prejudice and its likelihood to continue against the manumitted slaves and their race, and that knowledge was doubtless a motive that led to the amendment. By their manumission and citizenship the colored race became entitled to the equal protection of the laws of the States in which they resided; and the apprehension that through prejudice they might be denied that equal protection, that is, that there might be discrimination against them, was the inducement to bestow upon the national government the power to enforce the provision that no State shall deny to them the equal protection of the laws. Without the apprehended existence of prejudice that portion of the amendment would have been unnecessary, and it might have been left to the States to extend equality of protection.

In view of these considerations, it is hard to see why the statute of West Virginia should not be regarded as discriminating against a colored man when he is put upon trial for an alleged criminal offence against the State. It is not easy to comprehend how it can be said that while every white man is entitled to a trial by a jury selected from persons of his own race or color, or, rather, selected without discrimination against his color, and a negro is not, the latter is equally protected by the law with the former. Is not protection of life and liberty against race or color prejudice, a right, a legal right, under the constitutional amendment? And how can it be maintained that compelling a colored man to submit to a trial for his life by a jury drawn from a panel from which the State has expressly excluded every man of his race, because of color alone, however well qualified in other respects, is not a denial to him of equal legal protection?

We do not say that within the limits from which it is not excluded by the amendment a State may not prescribe the qualifications of its jurors, and in so doing make discriminations. It may confine the selection to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications. We do not believe the Fourteenth Amendment was ever intended to prohibit this. Looking at its history, it is clear it had no such purpose. Its aim was against discrimination because of race or color. As we have said more than once, its design was to protect an emancipated race, and to strike down all possible legal discriminations against those who belong to it. To quote further from 16 Wall., *supra :* " In giving construction to any of these articles [amendments], it is necessary to keep the main purpose steadily in view." " It is so clearly a provision for that race and that emergency, that a strong case would be necessary for its application to any other." We are not now called upon to affirm or deny that it had other purposes.

The Fourteenth Amendment makes no attempt to enumerate the rights it designed to protect. It speaks in general terms, and those are as comprehensive as possible. Its language is prohibitory ; but every prohibition implies the existence of rights and immunities, prominent among which is an immunity from inequality of legal protection, either for life, liberty, or property. Any State action that denies this immunity to a colored man is in conflict with the Constitution.

Concluding, therefore, that the statute of West Virginia, discriminating in the selection of jurors, as it does, against negroes because of their color, amounts to a denial of the equal protection of the laws to a colored man when he is put upon trial for an alleged offence against the State, it remains only to be considered whether the power of Congress to enforce the provisions of the Fourteenth Amendment by appropriate legislation is sufficient to justify the enactment of sect. 641 of the Revised Statutes.

A right or an immunity, whether created by the Constitution or only guaranteed by it, even without any express delegation of power, may be protected by Congress. *Prigg* v. *The Commonwealth of Pennsylvania,* 16 Pet. 539. So in

*United States* v. *Reese* (92 U. S. 214), it was said by the Chief Justice of this court: " Rights and immunities created by or dependent upon the Constitution of the United States can be protected by Congress.  The form and manner of the protection may be such as Congress in the legitimate exercise of its legislative discretion shall provide.  These may be varied to meet the necessities of the particular right to be protected." But there is express authority to protect the rights and immunities referred to in the Fourteenth Amendment, and to enforce observance of them by appropriate congressional legislation. And one very efficient and appropriate mode of extending such protection and securing to a party the enjoyment of the right or immunity, is a law providing for the removal of his case from a State court, in which the right is denied by the State law, into a Federal court, where it will be upheld.   This is an ordinary mode of protecting rights and immunities conferred by the Federal Constitution and laws.  Sect. 641 is such a provision.  It enacts that " when any civil suit or criminal prosecution is commenced in any State court for any cause whatsoever against any person who is denied, or cannot enforce, in the judicial tribunals of the State, or in the part of the State where such prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States, such suit or prosecution may, upon the petition of such defendant, filed in said State court at any time before the trial, or final hearing of the case, stating the facts, and verified by oath, be removed before trial into the next Circuit Court of the United States to be held in the district where it is pending."

This act plainly has reference to sects. 1977 and 1978 of the statutes which partially enumerate the rights and immunities intended to be guaranteed by the Constitution, the first of which declares that " all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, and shall be subject to like punishment,

pains, penalties, taxes, licenses, and exactions of every kind, and to no other." This act puts in the form of a statute what had been substantially ordained by the constitutional amendment. It was a step towards enforcing the constitutional provisions. Sect. 641 was an advanced step, fully warranted, we think, by the fifth section of the Fourteenth Amendment.

We have heretofore considered and affirmed the constitutional power of Congress to authorize the removal from State courts into the circuit courts of the United States, before trial, of criminal prosecutions for alleged offences against the laws of the State, when the defence presents a Federal question, or when a right under the Federal Constitution or laws is involved. *Tennessee* v. *Davis, supra,* p. 257. It is unnecessary now to repeat what we there said.

. That the petition of the plaintiff in error, filed by him in the State court before the trial of his case, made a case for removal into the Federal Circuit Court, under sect. 641, is very plain, if, by the constitutional amendment and sect. 1977 of the Revised Statutes, he was entitled to immunity from discrimination against him in the selection of jurors, because of their color, as we have endeavored to show that he was. It set forth sufficient facts to exhibit a denial of that immunity, and a denial by the statute law of the State.

There was error, therefore, in proceeding to the trial of the indictment against him after his petition was filed, as also in overruling his challenge to the array of the jury, and in refusing to quash the panel.

The judgment of the Supreme Court of West Virginia will be reversed, and the case remitted with instructions to reverse the judgment of the Circuit Court of Ohio county; and it is

*So ordered.*

MR. JUSTICE FIELD.

I dissent from the judgment of the court in this case, on the grounds stated in my opinion in *Ex parte Virginia (infra,* p. 349), and MR. JUSTICE CLIFFORD concurs with me.