The opinion of the court was delivered by
Watkins, J.
The accused was indicted for murder, and was found guilty of manslaughter and sentenced to imprisonment in the State penitentiary for a term of five years, and from the judgment and sentence has appealed.
I.
The first proposition tendered for consideration is that embraced in the defendant’s motion to quash the indictment on the ground that the venire drawn by the jury commissioners from which the grand and petit juries were drawn was exclusively composed of persons of the white race and did not contain the name of a single person of the black, or African, race, and that the accused, being of African descent, he was discriminated against solely on account of his race or color, in violation of his civil rights under the Fourteenth Amendment to the Constitution of the United States.
On the trial of this motion to quash there was a great deal of testimony taken, and it is incorporated into the transcript; and it fully establishes the fact that there was not a single person of African descent drawn on the venire at the term of court at which the indictment against the accused was found, notwithstanding the fact that there are a greater number of colored than of white voters in the parish of Red River, and' that some of the.colored voters can read and write. ■
But the proof shows that, as a general rule, the negroes of that parish are illiterate, and that a large majority of them are employed *905 as day laborers on cotton plantations and are frequently moving from place to place.
The clerk of court, one of the jury commissioners, was sworn as a witness and testified as to the manner of the drawing of the venire and said:
“ There is a general venire box, in which there are 300 names. On the 20th of January, 1893, the commissioners met to draw the jury for the March term, 1893, and we put in eighty names to complete the venire. There was not a negro’s name put in the box of eighty names. After these eighty names were put in the general venire box, eighty names were drawn out to serve at the March term, 1893, and out of the jury drawn for this term no negroes were drawn. When the jury commissioners met to draw the jury the time before the last, I do not know whether any negroes’ names were put in the venire box or not; but I do know that they were generally whites.”
Another member of the jury commission testified that “ there was no negro drawn to serve on the venire at this term. The commissioners put in the general venire (box) enough names to keep the number up to 300. The names were selected by the clerk before we came down. This is the way it is usually done (and) the jury commissioners ratified his selection. I do not think the colored people (were) excluded on account of their race and color. We usually take a few intelligent ones. * * * I don’t think there are many colored men in the parish that can read and write (though) there are some * * * It is a fact that some white jurors can not read and write. * * * The preference is given (to) the more intelligent.”
While it is undeniable that the exclusion from the general venire of all people of the African race on account of their color, or race, would be an abridgment of the privileges and rights of such citizens, within the meaning and intendment of the Fourteenth Amendment of the Federal Constitution, and would operate a denial to persons of that race who might be indicted, of the equal protection of the law, within the meaning of Strander vs. West Virginia, 100 U. S. 303; yet, in our conception, the evidence does not disclose such a case.
For it appears that there are in the general venire box three hundred names, from which are drawn the names which compose the general venire, from which the grand and petit juries are drawn. That at an ensuing term of court only a sufficient number of names is added by the jury commissioners to keep the general venire at *906 that, standard; that following this rule, the jury commissioners on this occasion put into the box eighty additional names, and from the three hundred names therein, the grand and petit juries were drawn. It is quite true that all the names that were drawn from the box were those of white people, though it is not established by any testimony in the record.that all of the three hundred names in the general box were those of white people. This is destructive of defend-, ant’s theory, because he had the chance of some colored persons being drawn from the box, unless it was exclusively made up of the names of white persons. And in addition to this argument is the fact sworn to by one of the jury commissioners, that people of African descent were not excluded from the venire box on account of their race or color.
The motion to quash was properly overruled.
II.
The defendant’s counsel requested of the trial judge that he should give the jury the following special charge, viz.:
“ If you find from the evidence that the deceased and his brother were waiting at the gate, one or both armed for the purpose of provoking a difficulty with the prisoner, and in furtherance of such purpose, when the prisoner reached the gate arrested his attention, and made an effort to draw a pistol; and if from all the facts and circumstances the prisoner honestly believed his life in imminent ■danger, he was not obliged to wait until the deceased actually drew his pistol but was fully justified in drawing his pistol and taking the .life of the deceased.”
It was refused for the following reasons, to-wit:
“It is hardly a correct statement of the law. It makes the defendant’s belief sufficient to justify his act without requiring that such belief should have been even apparently well founded, or a reasonable belief.
“ It is not a correct statement of the facts or the evidence; but such a blending of those that were proved with those that were not proved as to be misleading to the jury. There was no evidence that the deceased and his brother were waiting at the gate to provoke a difficulty. Besides, the law applicable to the case is believed to have been fully and fairly stated in the written charge already given before this (special) charge was asked for, and that the special charge *907 as far as applicable to the case was substantially covered by the general charge. The court is only obliged to charge the law applicable to the evidence in the case, and is not obliged to charge the law unsupported by any evidence.”
An examination of the judge’s written charge to the jury shows that he gave instructions to the jury in reference to the law of self-defence, and from the charge we make the following extract, viz.:
“ The defendant claims that the killing was done in self-defence and therefore no crime. The law of self-defence is that a person may repel force by force in defence of his person against any one who endeavors by violenee or surprise to take his life, or commit a known felony upon him; and in the exercise of this right, if a person is assaulted with a deadly weapon he is not obliged to retreat, but may pursue his adversary until he finds himself out of danger. A person has the right to act upon appearances, and if from the aets, declarations and conduct of the deceased, at the time, the accused had reasonable ground to believe that his life was in immediate danger, he has the right to defend himself without further delay, even though it should afterward appear that there was no danger at all. * * * Therefore, if you should believe (from the evidence) that the accused was attacked violently by Tom Vinson (the deceased), or that Tom Vinson drew or attempted to draw his pistol, and that he had apparent reason to believe and did believe that Vinson was then about to make a violent attack upon him, and that the prisoner then killed Vinson to save his own life, such killing would be self-defence and no crime.” (Our italics.)
In our opinion the judge gave to the jury correct instructions upon the law of self-defence; and, what is more to the purpose, in very nearly the terms of the requested special charge. For instance, the request of the special charge is that “ if from all the facts and circumstances the prisoner honestly believed his life was in imminent danger;” while the terms of the general charge are, viz.: “if from the acts, declarations and conduct of the accused, at the time, the accused had reasonable ground to believe that his life was in immediate danger;” and also, that if he had apparent reason to believe and did believe that (the deceased) was about to make a violent attack upon him.
. If there be any real and substantial difference between the terms of the charge requested and refused and the one given to the jury, the latter is the more favorable to the accused.
*908 ' The special request made by counsel for the prisoner was that the judge should charge the jury that it was sufficient that the prisoner “ honestly believed his life was in imminent danger,” whilst the instruction actually given was that “if the accused had reasonable ground to believe that his life was in immediate danger,” or “that he had apparent reason to believe and did believe that the deceased was about to make a violent attack upon him.”
■ It will be observed that the phrase “honestly believed” of the requested special charge is not employed in the general charge, but the phrases therein employed are “reasonable ground to believe” and “ apparent reason to believe and did believe.” And it seems apparent that the one selected by the judge is a stronger term than the one the.counsel employed.
In so far as the hypothetical statement of fact which prefaces the requested special charge is concerned, we must accept the theory of the judge; and particularly in view of the testimony that is brought up by the defendant in a bill of exceptions. A careful examination of the requested special charge and a comparison of it with the general charge-has satisfied us that the ruling of the judge below was correct.
III.
The next ground of objection taken to the ruling of the trial judge is that in refusing.the defendant a new trial. The only ground assigned for a new trial that is independent and not covered by other pleadings' and rulings in the ease is, that one of the panel of the petit jury made a memorandum of the testimony of some of the witnesses and carried same into the jury room with him. The contention of defendant’s counsel is that the juror in question did make a memorandum of the testimony of the first two witnesses on the part of the State and t carried it into the jury room with him; and that, on that account, great injury , was done'to the accused by such garbled and ex parte statement. As a witness on the trial of the rule for new trial, the juror in question testified as follows, to-wit:
“I was one of the jurors who tried Pomp Joseph. I took down some of the testimony. Took some of the testimony of the second witness. I noticed the counsel for the defendant looking at me, and one of the jurors behind me told me I had better quit writing. I then stopped writing and put the paper in my pocket. The testimony that I took down was of the first two State witnesses.”
*909 On cross-examination he said: “WhatI wrote was on the backs-of letters. I wrote two or three lines — the principal part of what the first witness said — during the time the second witness was on the stand. I did not show the writing to any of the other jurors. The case lasted all day and up to 10 o’clock at night. I used it after I got into the jury room — I tore it up. They stopped me before I got enough to be (of) any benefit to me and I tore it up. I tore it up soon after going into the jury room, and about eight hours before the verdict was rendered.”
Q,. “ How much did you write?”
A. “I wrote three or four lines five or six inches long across note paper. The defendant’s counsel saw me and one of the jurors called my attention to it. The defendant’s counsel made no objeet5on to the court. * * * I looked at the memoranda after I went to the
jury room, and there was so little of it that it was of no benefit, and I tore it up.”
This evidence fails to support the charge of misconduct of the juror — at least such misconduct as will vitiate the verdict of the jury.
The memorandum made was short. It was not exhibited to other jurors. It was torn up after the juror went into the jury room, and several hours before the verdict was rendered. The juror states that there was so little of it it was of no use to him and he destroyed it.
It is impossible to conceive of any injury resulting from so slight an indiscretion, or that an irregularity such as this could have prejudicially influenced the jury, or caused them any bias in their deliberations.
It is not for every irregularity in the conduct of a juror that the verdict of a jury may be set aside. The testimony must show, at least presumably, that the irregularity gives rise to a presumption of injury having been sustained by the accused.
This objection is not well taken.
IY.
The next objection urged was that a confession of the accused offered in evidence was not free and voluntary, and consequently not admissible. But the judge states that the witness answered that the confession was free and voluntary, and that no threats or inducements were offered the accused to induce the confession made.
*910 V.
Counsel having filed the motion to quash that is discussed in paragraph one of this opinion, called upon the district attorney to make a written answer to the same, either admitting or denying the allegations thereof, and he declined, and to his refusal he retained a bill of exceptions, the judge having declined to sustain the point made on the ground that there is neither rule of law or precedent to support the proposition.
This objection possesses the charm of novelty, but nothing more.
VI.
The counsel for the prisoner complains that the judge after having signed and caused to be filed a bill of exceptions, of his own motion, on the following day, without rule to show cause or other proceeding, made an addendum thereto, and to which they objected on the ground and for the reason “ that the judge has no right or authority to change the minutes of his court, or to amend, or add to his rulings, and more especially add to, amend, or alter bills of exceptions after the same become final and become a part of the record of the case.”
The judge overruled the defendant’s objections and maintained his right to make the alteration on the ground, to-wit:
“During the examination of the witness, Booth, counsel for the defendant asked that the proper basis b&laid before the confession was admitted, and the district attorney asked him the usual questions, in reply to which the witness said that it was free and voluntary, and that no threats or inducements were offered defendant to produce it. The defendant’s counsel then cross-examined him as to his remembering all that was said, and during this cross-examination asked that his evidence on the question of confession be taken down, which was done, from that point onward, ending with the words ‘ I don’t know, Mr. Booth, what I killed him for.’ This evidence was embodied in the bili of exceptions presented on yesterday by the defendant and signed by the court, without remembering, at the moment, to include what the witness had said before we began to write down his statement. This morning in open court, in presence of the accused and his counsel, the court announced the fact of this omission and its intention to add this statement of Booth’s evidence in the bill No. 1. Defendant’s counsel objected for reasons *911 above stated, but made no suggestion or pretension that the witness ' did not so testify. To which ruling counsel excepted,” etc.
A bill of exceptions is merely an exception to the opinion of the court on some purely incidental question that arises during the progress of the trial of a cause, and involving either a question of fact or law, and to which the judge is required to make a concise statement of the reasons influencing his opinion. When thus prepared and signed by the presiding judge, it must be filed among the records of the suit. O. P. 488 and 489.
In the instant case the bill of exceptions referred to involves a question of fact, and the trial judge evidently sought by the amendment he made, to correct a mistake or omission which, in his opin ion, affected the question under consideration seriously. It was part of the statement of the accused which formed an essential ingredient of his confession.
It seems to us quite reasonable that the judge should have entertained this view; and that he had a right to make the amendment under the circumstances related we think is clear.
While a bill of exceptions constitutes, when signed and filed, a part of the record, yet, for the purpose of accuracy and correctness of statement, it is under the judge’s supervision and control, during the progress of the trial, like the minutes of his court. And it has been uniformly and repeatedly held that the latter may be corrected conformably to the facts; and no doubt is suggested by defendant’s counsel as to the accuracy of the amendment.
This cause appears to have been tried with great care, and a marked degree of industry and ingenuity has been bestowed on its preparation, but we have arisen from a careful study of the record with the clear conviction that the accused has had a fair trial.
Judgment affirmed.