187 So.2d 861 (1966)
STATE of Mississippi
v.
Mrs. Virginia HALL.
No. 44220.
Supreme Court of Mississippi.
June 13, 1966.
*863 Joe T. Patterson, Atty. Gen., by G. Garland Lyell, Jr., Asst. Atty. Gen., Jackson, for appellant.
Mitchell & Rogers, Tupelo, for appellee.
JONES, Justice.
The State appeals from an order of the Circuit Court of Lee County quashing an indictment for murder returned by the grand jury of that county against the appellee. The sole ground of the motion was that under Mississippi Code Annotated section 1762 (1956) women were excluded from jury service and such denied to appellee the equal protection of the law as guaranteed by the Fourteenth Amendment of the United States Constitution. We do not agree, and the case is reversed and remanded.
Appellee bases her assertion upon the case of White v. Crook, 251 F. Supp. 401 (1966), decided February 7, by a United States District Court of Alabama. With deference, we do not consider that case binding here.
We begin the discussion of this matter with the statement, respectfully, that we yet are of the firm conviction:
1st. The Constitution is a living document for the operation and perpetuation of our government.
2nd. It should not be changed, expanded or extended beyond its settled intent and meaning by any court to meet daily changes in the mores, manners, habits, or thinking of the people. The power to alter is the power to erase. Such changes should be made by those authorized so to do by the instrument itself  the people. When a portion of the Constitution has been construed, considered and acted upon for decades in one way by all branches of government, both federal and state, such meaning should, in the interest of all concerned, not be changed except by amendment.
3rd. The power to prescribe the qualifications for jurors is in the legislature, and it has the power to make reasonable classifications.
4th. No citizen has the absolute right to serve upon a jury. That is a service demanded by the government. If he did have such a right, what would happen when one was peremptorily challenged but insisted on his right to serve? Of course, the peremptory challenge has been too long embodied in our system to now disallow  but it has been there no longer than the right of the legislative branch to say who shall be upon the list.
5th. The legislature has the right to exclude women so they may continue their service as mothers, wives, and homemakers, and also to protect them (in some areas, they are still upon a pedestal) from the filth, obscenity, and noxious atmosphere that so often pervades a courtroom during a jury trial.
The Fourteenth Amendment was adopted in 1868 as an aftermath of the Civil War.
In 1879, the members of the Supreme Court of the United States were men living among and familiar with the hatreds and other emotions aroused by such conflict and prevalent at the time of the adoption of the Fourteenth Amendment and of the general feeling that prompted the adoption of the Fourteenth Amendment.
The Court recorded in Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879), for those interested, from a historical standpoint, the surrounding circumstances and reasons for its adoption, and, for those animated by legalistic purposes, *864 it recorded, in addition, the intent and meaning of said Amendment, together with its proper construction.
"This is one of a series of constitutional provisions having a common purpose; namely, securing to a race recently emanicipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoy. The true spirit and meaning of the amendments, as we said in the Slaughter-House Cases (16 Wall. 36 [21 L.Ed. 394]), cannot be understood without keeping in view the history of the times when they were adopted, and the general objects they plainly sought to accomplish. At the time when they were incorporated into the Constitution, it required little knowledge of human nature to anticipate that those who had long been regarded as an inferior and subject race would, when suddenly raised to the rank of citizenship, be looked upon with jealousy and positive dislike, and that State laws might be enacted or enforced to perpetuate the distinctions that had before existed. Discriminations against them had been habitual. It was well known that in some States laws making such discriminations then existed, and others might well be expected. The colored race, as a race, was abject and ignorant, and in that condition was unfitted to command the respect of those who had superior intelligence. Their training had left them mere children, and as such they needed the protection which a wise government extends to those who are unable to protect themselves. They especially needed protection against unfriendly action in the States where they were resident. It was in view of these considerations the Fourteenth Amendment was framed and adopted. It was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States. It not only gave citizenship and the privileges of citizenship to persons of color, but it denied to any State the power to withhold from them the equal protection of the laws, and authorized Congress to enforce its provisions by appropriate legislation. To quote the language used by us in the Slaughter-House Cases, `No one can fail to be impressed with the one pervading purpose found in all the amendments, lying at the foundation of each, and without which none of them would have been suggested,  we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over them.' So again: `The existence of laws in the States where the newly emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied, and by it (the Fourteenth Amendment) such laws were forbidden. If, however, the States did not conform their laws to its requirements, then, by the fifth section of the article of amendment, Congress was authorized to enforce it by suitable legislation.' And it was added, `We doubt very much whether any action of a State, not directed by way of discrimination against the negroes, as a class, will ever be held to come within the purview of this provision.'" (100 U.S. at 306-307, 25 L.Ed. at 665.)
* * * * * *
"We do not say that within the limits from which it is not excluded by the amendment a State may not prescribe the qualifications of its jurors, and in so doing make discriminations. It may confine the selection to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications. We do not believe the Fourteenth Amendment was ever intended to prohibit this. Looking at its history, it is clear it had no such *865 purpose. Its aim was against discrimination because of race or color. * *" (100 U.S. at 310, 25 L.Ed. at 666.)
While this last quoted paragraph was many years later referred to as dictum, still it shows now the right to vote was considered and such thinking prevailed universally throughout the nation for fifty years or more before the first efforts were made to change, insofar as women were concerned, and the subsequent changes were all made by the legislatures.
Prior to the Strauder case, in Minor v. Happersett, 88 U.S. (21 Wall.) 162, 22 L.Ed. 627 (1875), and some few years after the adoption of the Fourteenth Amendment, Virginia L. Minor, et al., sued Reese Happersett, a voter registrar in Missouri, for failure to register plaintiff. The Missouri statute said "male" citizens were the only ones entitled to vote. In discussing the constitutional amendments, it was there said:
"If the right of suffrage is one of the necessary privileges of a citizen of the United States, then the constitution and laws of Missouri confining it to men are in violation of the Constitution of the United States, as amended, and consequently void. The direct question is, therefore, presented whether all citizens are necessarily voters.
"The Constitution does not define the privileges and immunities of citizens. For that definition we must look elsewhere. In this case we need not determine what they are, but only whether suffrage is necessarily one of them.
"It certainly is nowhere made so in express terms. The United States has no voters in the States of its own creation." * * * (88 U.S. at 170, 22 L.Ed. at 629.)
"The amendment did not add to the privileges and immunities of a citizen. It simply furnished an additional guaranty for the protection of such as he already had. No new voters were necessarily made by it. Indirectly it may have had that effect, because it may have increased the number of citizens entitled to suffrage under the constitution and laws of the States, but it operates for this purpose, if at all, through the States and the State laws, and not directly upon the citizen.
"It is clear, therefore, we think, that the Constitution has not added the right of suffrage to the privileges and immunities of citizenship as they existed at the time it was adopted. This makes it proper to inquire whether suffrage was coextensive with the citizenship of the States at the time of its adoption. If it was, then it may with force be argued that suffrage was one of the rights which belonged to citizenship, and in the enjoyment of which every citizen must be protected. But if it was not, the contrary may with propriety be assumed." * * * (88 U.S. at 171-172, 22 L.Ed. at 629.)
After discussing the laws of the several states as to suffrage, the Court then said:
"In this condition of the law in respect to suffrage in the several States it cannot for a moment be doubted that if it had been intended to make all citizens of the United States voters, the framers of the Constitution would not have left it to implication. So important a change in the condition of citizenship as it actually existed, if intended, would have been expressly declared.
"But if further proof is necessary to show that no such change was intended, it can easily be found both in and out of the Constitution. By Article 4, section 2, it is provided that `the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States.' If suffrage is necessarily a part of citizenship, then the citizens of each State must be entitled to vote in the several States precisely as their citizens are. This is more than asserting that they may change their residence and become *866 citizens of the State and thus be voters. It goes to the extent of insisting that while retaining their original citizenship they may vote in any State. This, we think, has never been claimed." * * * (88 U.S. at 173-174, 22 L.Ed. at 630.)
If the right to vote is not a right and privilege protected by the Constitution, how can it be said the right to serve on a jury is?
It was generally recognized that this was the law, and it was not until 1920 when the Nineteenth Amendment was adopted that women were granted the right of suffrage. This amendment did not include the right to serve upon juries although Strauder, supra, had been decided many years prior thereto, and even then (1920) women were not permitted to serve upon juries in Federal Courts, unless the state in which the Court was sitting, by legislative act, had authorized them to serve on state juries.
Again, in 1947, the Supreme Court of the United States, in discussing the requirement for women on juries, said in Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947):
"To establish the unfairness of this tribunal and the lack of due process afforded to one who is being tried before it, the defendants assert two defects in its composition: first, that it unconstitutionally excluded women, and, second, that it unconstitutionally excluded laborers, craftsmen, service employees, and others of like occupation, amounting in sum to the exclusion of an economic class.
"Assuming that defendants, not being women, have standing to complain of exclusion of women from the general and special jury panels, we are unable to sustain their objection. Approximately 7,000 women were on the general panel of 60,000 and 30 were on the special panel. One served on the jury which convicted the petitioners. The proportion of women on the jury panels did not equal their proportion of the population. There may be no logical reason for this, but there is an historical one. Until recently, and for nearly a half-century after the Fourteenth Amendment was adopted, it was universal practice in the United States to allow only men to sit on juries. The first state to permit women jurors was Washington, and it did not do so until 1911. In 1942 only 28 states permitted women to serve on juries and they were still disqualified in the other 20. Moreover, in 15 of the 28 states which permitted women to serve, they might claim exemption because of their sex. It would, in the light of this history, take something more than a judicial interpretation to spell out of the Constitution a command to set aside verdicts rendered by juries unleavened by feminine influence. The contention that women should be on the jury is not based on the Constitution, it is based on a changing view of the rights and responsibilities of women in our public life, which has progressed in all phases of life, including jury duty, but has achieved constitutional compulsion on the states only in the grant of the franchise by the Nineteenth Amendment. We may insist on their inclusion on federal juries where by state law they are eligible but woman jury service has not so become a part of the textual or customary law of the land that one convicted of crime must be set free by this Court if his state has lagged behind what we personally may regard as the most desirable practice in recognizing the rights and obligations of womanhood." (332 U.S. at 289-290, 67 S.Ct. at 1628-1629, 91 L.Ed. at 2060-2061.)
Afterwards, in 1952, the Supreme Court of the United States, in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1952), approved the holding in Strauder, supra, when it said:
"Discriminations against a race by barring or limiting citizens of that race from participation in jury service are odious to our thought and our Constitution. *867 This has long been accepted as the law. Brunson v. State of North Carolina, 333 U.S. 851, 68 S.Ct. 634, 92 L.Ed. 1132; Cassell v. State of Texas, 339 U.S. 282, 286-287, 70 S.Ct. 629, 631, 94 L.Ed. 839; State v. Peoples, 131 N.C. 784, 42 S.E. 814. Such discrimination is forbidden by statute, 18 U.S.C. § 243, 18 U.S.C.A. § 243, and has been treated as a denial of equal protection under the Fourteenth Amendment to an accused, of the race against which such discrimination is directed. Neal v. State of Delaware, 103 U.S. 370, 390, 26 L.Ed. 567. The discrimination forbidden is racial discrimination, however, directed to accomplish the result of eliminating or limiting the service of the proscribed race by statute or by practice. Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Patton v. State of Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76. It was explained in 1880 by this Court, when composed of justices familiar with the evils the Amendment sought to remedy, as permitting a state to `confine the selection (of jurors) to males, to freeholders, to citizens, to persons within certain ages or to persons having educational qualifications.' Strauder v. State of West Virginia, 100 U.S. 303, 310, 25 L.Ed. 664. Cf. Franklin v. State of South Carolina, 218 U.S. 161, 167-168, 30 S.Ct. 640, 54 L.Ed. 980. Fay v. People of State of New York, 332 U.S. 261, 268-272, 67 S.Ct. 1613, 1617-1619, 91 L.Ed. 2043." * * * (344 U.S. at 470-471, 73 S.Ct. at 414, 97 L.Ed. at 496.)
The Court further said:
"* * * We recognize, too, that we are now reviewing a constitutional objection to a state court conviction, and we may not act to alter practices of a state which are short of a denial of equal protection or due process in the selection of juries. States should decide for themselves the quality of their juries as best fits their situation so long as the classifications have relation to the efficiency of the jurors and are equally administered.
"Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty. Short of an annual census or required population registration, these tax lists offer the most comprehensive source of available names. We do not think a use, nondiscriminatory as to race, of the tax lists violates the Fourteenth Amendment, nor can we conclude on the evidence adduced that the results of the use require a conclusion of unconstitutionality." * * * (344 U.S. at 473-474, 73 S.Ct. at 415-416, 97 L.Ed. at 497-498.)
Carrying the matter further, the Supreme Court of the United States, in Hoyt v. State of Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), considered the question where defendant, a woman, had been convicted of second degree murder and appealed, assigning her trial before an all-male jury as violative of the Fourteenth Amendment.
The Florida statute provided, in effect, that women could serve, if they desired. The Court held:
"Of course, these premises misconceive the scope of the right to an impartially selected jury assured by the Fourteenth Amendment. That right does not entitle one accused of crime to a jury tailored to the circumstances of the particular case, whether relating to the sex or other condition of the defendant, or to the nature of the charges to be tried. It requires only that the jury be indiscriminately drawn from among those eligible in the community for jury service, untrammelled by any arbitrary and systematic exclusions. See Fay v. [People of State of] New York, 332 U.S. 261, 284-285, 67 S.Ct. 1613, 1625, 1626, 91 L. *868 Ed. 2043, and the cases cited therein. The result of this appeal must therefore depend on whether such an exclusion of women from jury service has been shown.
"We address ourselves first to appellant's challenge to the statute on its face.
"Several observations should initially be made. We of course recognize that the Fourteenth Amendment reaches not only arbitrary class exclusions from jury service based on race or color, but also all other exclusions which `single out' any class of persons `for different treatment not based on some reasonable classification.' Hernandez v. [State of] Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866. We need not, however, accept appellant's invitation to canvass in this case the continuing validity of this Court's dictum in Strauder v. [State of] West Virginia, 100 U.S. 303, 310, 25 L.Ed. 664, to the effect that a State may constitutionally `confine' jury duty `to males.' This constitutional proposition has gone unquestioned for more than eighty years in the decisions of the Court, see Fay v. [People of State of] New York, supra, 332 U.S. at 289-290, 67 S.Ct. at 1628, and had been reflected, until 1957, in congressional policy respecting jury service in the federal courts themselves. Even were it to be assumed that this question is still open to debate, the present case tenders narrower issues.
"Manifestly, Florida's § 40.01(1) does not purport to exclude women from state jury service. Rather, the statute `gives to women the privilege to serve but does not impose service as a duty.' Fay v. [People of State of] New York, supra, 332 U.S. at 277, 67 S.Ct. at 1622. It accords women an absolute exemption from jury service unless they expressly waive that privilege. This is not to say, however, that what in form may be only an exemption of a particular class of persons can in no circumstances be regarded as an exclusion of that class. Where, as here, an exemption of a class in the community is asserted to be in substance an exclusionary device, the relevant inquiry is whether the exemption itself is based on some reasonable classification and whether the manner in which it is exercisable rests on some rational foundation.
"In the selection of jurors Florida has differentiated between men and women in two respects. It has given women an absolute exemption from jury duty based solely on their sex, no similar exemption obtaining as to men. And it has provided for its effectuation in a manner less onerous than that governing exemptions exercisable by men: women are not to be put on the jury list unless they have voluntarily registered for such service; men, on the other hand, even if entitled to an exemption, are to be included on the list unless they have filed a written claim of exemption as provided by law. Fla. Stat., 1959, § 40.10, F.S.A.
"In neither respect can we conclude that Florida's statute is not `based on some reasonable classification,' and that it is thus infected with unconstitutionality. Despite the enlightened emancipation of women from the restrictions and protections of bygone years, and their entry into many parts of community life formerly considered to be reserved to men, woman is still regarded as the center of home and family life. We cannot say that it is constitutionally impermissible for a State, acting in pursuit of the general welfare, to conclude that a woman should be relieved from the civic duty of jury service unless she herself determines that such service is consistent with her own special responsibilities." (368 U.S. at 59-62, 82 S.Ct. at 161-163, 7 L.Ed.2d at 120-122.)
If it is a reasonable classification to exclude all women except those who desire to serve, how can it be said that the total exclusion is not a "reasonable classification?" In other words, how can any classification of jurors by sex be unconstitutional, if some classification is permitted?
*869 We are in accord with the following statement of the Supreme Court of North Carolina, in State v. Emery, 224 N.C. 581, 31 S.E.2d 858, 157 A.L.R. 441 (1944):
"It is contended, however, that since 1868 the public policy of the State has undergone a change in respect of the rights of women, which should carry with it an elimination of the disqualification for jury service propter defectum sexus. Patton v. United States, supra [281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854]. The position is that women are now politically the peers of men, and hence they should be permitted to serve on juries. State v. Chase, 106 Or. 263, 211 P. 920. But jury service is not a right or privilege guaranteed to anyone. State v. Walker, 192 Iowa 823, 185 N.W. 619, 35 C.J. 245. It is an obligation imposed by law upon those who come within a designated class possessing the prescribed qualifications. 31 AM.Jur. 650. [sic] Women have not yet been assigned the duty of serving on grand or petit juries in this jurisdiction.
"The General Assembly is at liberty to impose the burden of jury service on some and relieve others of the obligation, provided the classification is not in derogation of the 14th Amendment to the Constitution of the United States or of our own Constitution. Norris v. [State of] Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; State v. Peoples, 131 N.C. 784, 42 S.E. 814. Of course, to single out the members of one race for jury duty and exclude those equally qualified of another would be an unwarranted discrimination of which members of the excluded race could rightfully complain when called upon to answer or go to trial on an indictment in the courts. Carter v. [State of] Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839; Neal v. [State of] Delaware, 103 U.S. 370, 26 L.Ed. 567; Strauder v. [State of] West Virginia, 100 U.S. 303, 25 L.Ed. 664; State v. Henderson, 216 N.C. 99, 3 S.E.2d 357. But classification on the basis of sex, applicable alike to all races, is after the manner of the common law and has persisted throughout the history of the State. State v. Sims, 213 N.C. 590, 197 S.E. 176; 35 C.J. 245." (31 S.E.2d at 862.)
The general law as to classification by sex is stated in 16A C.J.S. Constitutional Law § 544 at 480-482 (1956):
"Discrimination between the sexes with respect to matters in which sex is a material factor may be made by statute or other state action, without violating the equal protection guaranty, if the classification is a natural and reasonable one; and such discrimination may be made in favor of women. A state may, without violation of the equal protection guaranty, deny to women the right to sell intoxicating liquors or deny to females a license or the right to serve as bartenders; and it may forbid the employment or admission of women in or to places in which intoxicating liquors are sold. Since such activities by women may, in the allowable legislative judgment, give rise to moral and social problems against which it may devise preventive measures, the legislature need not make the prohibition absolute but may provide for reasonable exceptions, as where as to a defined group of females other factors are operating which either eliminate or reduce the moral and social problems otherwise calling for prohibition. Prior to the adoption of the Nineteenth Amendment to the federal Constitution, providing that the right of citizens to vote shall not be denied or abridged on account of sex, a state could deny women the right to vote." * * *
* * * * * *
"Women as jurors. The state may, without violation of the equal protection guaranty, deny to women the right to serve as jurors. Such denial does not deprive either a female or male defendant of equal protection of the laws. However, *870 under statutes authorizing women to serve as jurors, there must be no discrimination against them in the selection of jurors, if they meet the prescribed requirements as to qualifications, but the constitutional right of accused to equal protection of the laws is not infringed by failure to include any women among those summoned as prospective jurors. A constitutional and statutory provision that no woman shall be drawn for jury service unless she has previously filed a written declaration of her desire to be subject to such service, is not invalid as discriminatory."
See also, In re Grilli, 110 Misc. 45, 179 N.Y.S. 795, affirmed 192 App.Div. 885, 181 N.Y.S. 938 (1920).
Even the Federal Courts and Congress considered the Fourteenth Amendment as not bestowing upon women the right to serve upon juries. The Federal Statute, United States Code Annotated Title 28 section 1861, was so worded that women could not serve in Federal Courts as jurors unless the law of the state where the court was being held so permitted, and, in order to make them eligible to serve in such courts everywhere, the statute was amended September 9, 1957, eighty-nine years after adoption of the Fourteenth Amendment.
In conclusion, we are convinced that the fixing of qualification for juries is a legislative matter and that, if it is necessary to resort to classification, such by sex is reasonable. As further bearing upon the legislative prerogative, we understand there has been introduced in our legislature a bill to permit women to serve on juries. We are unwilling to take from the legislature that which the people have entrusted to it.
We, therefore, reverse the case and remand it to the court from whence it came.
Reversed and remanded.
All Justices concur, except the Chief Justice, who dissents.
ETHRIDGE, Chief Justice (dissenting):
Mississippi Code Annotated section 1762 (1956) completely and absolutely excludes women from jury service in this state. The question is whether this total exclusion of women from jury service is an invalid classification, in violation of the due process and equal protection clauses of the Fourteenth Amendment, United States Constitution, and Section 14, Mississippi Constitution. I think it is.
The Fourteenth Amendment prohibits prejudicial disparities before the law for all citizens, including women. Over half the population of the United States consists of women. In Lee County, Mississippi, where appellee was indicted, there is a total of 23,839 persons who are twenty-one years of age and over. Of these 12,651 are women, and 11,188 are men. Lee County has 7,529 male registered voters, and 6,884 female registered voters. The record reflects that from 1927 to the present, no women have been drawn to serve or have served on either a petit or grand jury of the Circuit Court of Lee County.
After hearing this evidence on a motion to quash the indictment, the circuit court correctly concluded:
This Court believes that the law on the constitutional question involved here is clear. There are rules, just as there are pieces of machinery, that are useful as long as they express life in our society. Life passed them by and left them behind and the rule excluding women, * * * denying women the right to serve on juries is one of these rules.
In White v. Crook, 251 F. Supp. 401 (U.S.D.C.Ala. 1966), a three-judge federal district court held that the Alabama statute completely excluding women from jury service was invalid because it denied equal protection of the laws. Since White v. Crook, only two states in the Union have statutes completely and absolutely excluding women from jury service  South Carolina and Mississippi.
*871 Mississippi was one of the first states to emancipate women from the medieval, common-law limitations on their right to own and control property. This occurred before the Civil War. The Nineteenth Amendment, effective in 1920, prohibited denial of their right to vote. Equal participation in the administration of justice is also a fundamental right of citizenship. Assuredly this would include the right to serve on juries. The majority opinion concludes that whether women shall serve on juries is a legislative question. However, that does not answer the issue of whether absolute denial on the basis of sex only is a denial of due process and equal protection of the laws.
Jury service is not just a privilege, but a form of participation in the processes of government. It is a responsibility and right possessed by all citizens, regardless of sex. Certainly a statute completely and absolutely excluding over one-half the population of this state from eligibility for jury service is a classification without any reasonable basis. For physiologic and other reasons, a state may validly grant women an elective exemption from jury service. But Mississippi wholly denies them the right to participate as members of juries. A classification must have some reasonable basis in order to comply with due process and equal protection. A complete exclusion of half the population with no rational basis for the classification, other than sex, is a denial to the women citizens of this state of their constitutional right.
The cases cited and quoted in the controlling opinion do not decide this issue, in my opinion. Hoyt v. State of Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), involved a Florida statute permitting but not requiring women to serve on juries. The following statement in Hoyt clearly predicts the constitutional fate of an absolute exclusion of women from jury service:
Finding no substantial evidence whatever in this record that Florida has arbitrarily undertaken to exclude women from jury service, a showing which it was incumbent on appellant to make, Hernandez v. [State of] Texas, supra, 347 U.S. at 479-480, 74 S.Ct. at 671; Fay v. [People of State of] New York, supra, 332 U.S. at 285, 67 S.Ct. at 1626, we must sustain the judgment of the Supreme Court of Florida. (82 S.Ct. at 166-167).
In short, I think that a state's complete exclusion of women from jury service is so arbitrary and unreasonable as to be an unconstitutional deprivation of due process and equal protection of the laws. A holding to this effect should be prospective only in its application. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). For these reasons, I respectfully dissent from the majority opinion.