# SUPREME COURT OF THE UNITED STATES

## ALICIA THOMPSON *v.* JANELLE HENDERSON

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME
COURT OF WASHINGTON

No. 22–823.  Decided June 30, 2023

The petition for a writ of certiorari is denied.

Statement of JUSTICE ALITO, with whom JUSTICE THOMAS joins, respecting the denial of certiorari.

I concur in the denial of certiorari because this case is in an interlocutory posture, and it is not clear whether it presents any "federal issue" that has been "finally decided by the" Washington Supreme Court. *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 480 (1975); see 28 U. S. C. §1257. But if the Washington courts understand the decision below to be as sweeping as it appears, review may eventually be required.

This case started as an ordinary tort suit over a car accident. The victim of the accident, plaintiff Janelle Henderson, is black, as was her trial counsel. Alicia Thompson, the defendant, is white, as was her trial counsel. Thompson admitted fault, so the suit was over damages. Henderson claimed that the whiplash she suffered from the accident "seriously exacerbated" her Tourette's syndrome, and she asked for $3.5 million in damages. 200 Wash. 2d 417, 422–424, 518 P. 3d 1011, 1017 (2022). Defense counsel naturally tried to convince the jury that such a large award was not justified, and the jury, which awarded Henderson only $9,200, was apparently persuaded. *Id.*, at 422, 518 P. 3d, at 1017. Henderson moved for a new trial, claiming that the small award was based on racial bias, but the trial court denied the motion without a hearing. *Id.*, at 428, 518 P. 3d, at 1019–1020.

In a remarkable decision, the Washington Supreme

Court reversed due to the possibility that the jury's award was tainted by prejudice, and it remanded for a hearing that appears to have no precedent in American law. In support of its decision, the court cited several statements made by defense counsel in her closing argument. It pointed to defense counsel's description of Henderson as "*quite combative*" on the witness stand and her description of Thompson as "*intimidated and emotional* about the process." *Id.*, at 425, 518 P. 3d, at 1018 (internal quotation marks omitted; emphasis in original). The court found that these comments played on stereotypes about the "'angry Black woman'" and the "victimhood" of white women. *Id.*, at 436–437, and n. 8, 518 P. 3d, at 1023–1024, and n. 8. The court also cited defense counsel's insinuation that Henderson was motivated by a desire for a financial windfall, as well as her suggestion that Henderson could not have suffered $3.5 million in damages since she had not even mentioned the accident when she saw her doctor a short time thereafter. *Id.*, at 425, 518 P. 3d, at 1018. The court thought that this argument "alluded to racist stereotypes"—that black women are "lazy, deceptive, and greedy" and are "untrustworthy and motivated by the desire to acquire an unearned financial windfall." *Id.*, at 437, 518 P. 3d, at 1024. The court also faulted defense counsel for suggesting that Henderson's lay witnesses, all of whom were black, had been prepared or coached because they all used the same phrase—"'life of the party'"—to describe Henderson's personality before the accident. *Ibid.* The court viewed this tactic as inviting jurors to make decisions about these witnesses "as a group and . . . based on biases about race and truthfulness." *Id.*, at 438, 518 P. 3d, at 1024.

Because of these comments by defense counsel, the court found that an objective observer "*could* conclude that racism was a factor in the verdict," and it therefore held "that Henderson is entitled to an evidentiary hearing on her new

trial motion." *Id.*, at 429, 439, 518 P. 3d, at 1020, 1025 (emphasis in original). The court added that "[a]t that hearing, the [trial] court must presume racism was a factor in the verdict and Thompson bears the burden of proving it was not." *Id.*, at 429, 518 P. 3d, at 1020.

The Washington Supreme Court's decision raises serious and troubling issues of due process and equal protection. In some cases, it will have the practical effect of inhibiting an attorney from engaging in standard and long-accepted trial practices: attempting to undermine the credibility of adverse witnesses, seeking to bolster the credibility of the attorney's client, raising the possibility of a counterparty's pecuniary motives, and suggesting that witnesses may have been coached or coordinated their stories. Such tactics are common and have long been viewed as proper features of our adversarial system. See, *e.g.*, *Geders* v. *United States*, 425 U. S. 80, 89–90 (1976) (emphasizing that "[s]killful cross-examination" is a remedy to deal with "'coached' witnesses"); *Marcic* v. *Reinauer Transp. Cos.*, 397 F. 3d 120, 125 (CA2 2005) ("A claim for money damages does create a financial incentive to be untruthful, and it was not improper for opposing counsel to invoke this incentive in an attempt to impeach plaintiff"); Fed. Rule Evid. 801(d)(1)(B)(i) (contemplating impeachment based on "improper influence or motive").

"'Due process requires that there be an opportunity to present every available defense,'" *Lindsey* v. *Normet*, 405 U. S. 56, 66 (1972) (quoting *American Surety Co.* v. *Baldwin*, 287 U. S. 156, 168 (1932)), but the decision below attaches a high price to the use of these run-of-the-mill defenses in cases where parties are of particular races. The Washington Supreme Court endorsed an evidentiary hearing based on the mere "*possibility*" of bias, and its analysis appears to hold that such litigation strategies *per se* raise at least the "possibility" of such bias. 200 Wash. 2d, at 434, 518 P. 3d, at 1023 (emphasis added). Moreover, the State

Supreme Court's rule requires the nonmoving party to prove at a hearing *not* that it did not intend to appeal to racial bias, but that racial bias (perhaps even subconscious bias) had no *impact on the jurors.* See *ibid.* How the Washington Supreme Court thinks this can be done is unclear.

In sum, the opinion below, taken at face value, appears to mean that in any case between a white party and a black party, the attorney for the white party must either operate under special, crippling rules or expect to face an evidentiary hearing at which racism will be presumed and the attorney will bear the burden of somehow proving his or her innocence. It is possible that the Washington Supreme Court will subsequently interpret its brand-new decision more narrowly, but the procedures it appears to set out would raise serious due-process concerns.

The Washington Supreme Court's opinion is also on a collision course with the Equal Protection Clause, as our recent opinion in *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. ___ (2023) (*SFFA*), demonstrates. The procedures the state court has imposed appear likely to have the effect of cordoning off otherwise-lawful areas of inquiry and argument solely because of race, violating the central constitutional command that the law must "be the same for the black as for the white; that all persons . . . shall stand equal before the laws of the States." *Id.*, at ___ (slip op., at 10) (quoting *Strauder* v. *West Virginia*, 100 U. S. 303, 307 (1880)). The Washington Supreme Court justified its prophylactic rules in part by reasoning that "[r]acism is endemic" in our society, 200 Wash. 2d, at 421, 518 P. 3d, at 1016, and that "*implicit, institutional, and unconscious biases, in addition to purposeful discrimination*, have influenced jury verdicts in Washington State," *id.*, at 435, 518 P. 3d, at 1023 (emphasis in original). But as we reaffirmed in *SFFA*, the Fourteenth Amendment's equal-treatment principle yields only when necessary to remediate "specific, identified instances of . . .

discrimination that violat[e] the Constitution or a statute," not generalized past or ongoing discrimination. 600 U. S., at \_\_\_ (slip op., at 15). The decision of the Washington Supreme Court, however, threatens "to inject racial considerations into every [litigation] decision" parties make. *Texas Dept. of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U. S. 519, 543 (2015).

Nothing in the papers before us suggests that defense counsel would have tried this case differently or that the jury award would have been larger if the races of the plaintiff and defendant had been different. As a result, the decision below, far from combating racism, institutionalizes a variation of that odious practice. See *SFFA*, 600 U. S., at \_\_\_ (slip op., at 38) (discussing the unfitness of the judiciary to determine whether reliance on race is benevolent rather than malign).

The decision below, like the decision in *Roberts* v. *McDonald*, No. 22–757, in which I have filed a separate statement, illustrates the danger of departing from the foundational principle that in the United States all people are entitled to "equal justice under law," as the façade of our building proclaims. Every one of the 330 million inhabitants of our country is a unique individual and must be treated as such by the law. It is not an exaggeration to say that our extraordinarily diverse population will not be able to live and work together harmoniously and productively if we depart from that principle and succumb to the growing tendency in many quarters to divide Americans up by race or ancestry.